## BUFFALO SUPERIOR COURT

ABRAHAM J. HEINEMAN agt. THE GRAND TRUNK RAILWAY COMPANY OF CANADA.

*Railroad corporations*, engaged in the transportation of property, are subject to the absolute responsibility, which by the common law, rests upon *common carriers;* they are, except as against loss or injury occasioned by the act of God, or of a public enemy, *insurers* of the safe transportation and delivery of the property intrusted to them for carriage.

*Common carriers* cannot, *by contract*, shield themselves from liability for their own fraud, or their own willful act or negligence ; but they may contract against

liability for that low degree of negligence or want of care on their part which is not equivalent to willful or wanton neglect of duty or recklessness.

*Common carriers* may also by *special contract* relieve themselves from all responsibility for *injury* to *or loss of the property* intrusted to them for carriage, occasioned by the *negligence, misconduct, fraud or felony* of their *employees or servants.*

Where the plaintiff signed a special contract made by the defendants as common carriers, in which was a clause that "the owner of the within mentioned animals undertakes all risk of loss, injury, damage and other contingencies, in loading, unloading, conveyance and otherwise," and by which contract the defendants undertook to transport for the plaintiff from Stratford, in Canada West, to Buffalo, in this State, a car load of horses, and, as the plaintiff alleged, the defendants carelessly, negligently, wrongfully and willfully, run the car containing the horses on to a side track of its road, and kept them locked up for four days and nights without food or drink, and by its agents refused to permit them to be unloaded so that they could be fed—it being impossible to feed them in the car ; by reason whereof the horses were nearly starved to death and thereby rendered comparatively valueless.

*Held,* that an action by the plaintiff against the defendants for damages by reason of such negligent, wrongful and willful acts, could not be sustained. The plaintiff was properly *non-suited* (VERPLANCK, *J. dissenting*).

*Argued June General Term,* 1866, *and decided September* 4, 1866.

*Before* VERPLANCK, *P. J.,* MASTEN *and* CLINTON, *Justices.*

THIS action was brought to recover damages for injuries sustained by a car load of horses while being transported by the defendant for the plaintiff from Stratford, in Canada West, to Buffalo, in this state, under a special agreement. It is charged in the complaint that the defendant " carelessly, negligently, wrongfully and willfully," run the car containing the horses in question on to a side track of its road, and kept them locked up for four days and nights without food or drink, and by its station agent (no other person representing the company being present), refused to permit them to be unloaded so that they could be fed, it being impossible to feed them while in the car.

On the trial, the defendants' incorporation was admitted, and that it was engaged in transporting live stock from Stratford, C. W., to Buffalo. The plaintiff proved and put in evidence the contract under which the horses were shipped, which is as follows :

No. 87.        GRAND TRUNK RAILWAY.        ( Bk. 33.
Live Stock Ticket, *March* 15, 1866.

The Grand Trunk Railway Company will please receive the undermentioned, consigned to A. J. Heineman, and forward to Buffalo, subject to their tariff and the conditions expressed on the other side.

| No. of cars. | Quantity. | Description. | Rate. | Amount. $ c. | Paid on $ c. | Paid. $ c. | To pay. |
|---|---|---|---|---|---|---|---|
| 2589 | 13 | Horses. | $ c. | 23 \| 20 | | 23 \| 20 | $ c. |
| Total..... | | | | | | | |

On the reverse side ticket read as follows :

GRAND TRUNK RAILWAY.    CONDITIONS OF CARRIAGE.

I. The owner of the within mentioned animals undertakes all risk of loss, injury, damage and other contingencies, in loading, unloading, conveyance and otherwise.

II. The railway company do not undertake to forward the animals by any particular train, or at any specified hour ; neither are they responsible for the delivery of the animals within any certain time, or for any particular market.

III. When free passes are given to persons in charge of animals, it is only on the express condition that the railway company are not responsible for any negligence, default, misconduct or otherwise, on the part of the. company or their servants, or of any other person or persons whomsoever, causing or tending to the cause of the death, injury or detention of persons with such free passes, and that whether such passes are used in traveling by any regular passenger train, or by any other train whatever.

I agree to the above conditions.

A. J. HEINEMAN,
Owner or on the owners behalf.

No. 87.        GRAND TRUNK RAILWAY.        (Bk. 33.
Live Stock Ticket, *March* 15, 1866.

Received from A. J. Heineman, the undermentioned, consigned to A. J. Heineman, to be carried on the conditions expressed on the other side.    Buffalo.

Heineman agt. The Grand Trunk Railway Co.

| No. of cars. | Quantity | Description. | Rate. | Amount. | Paid on $ c. | Paid. $ c. | To pay. |
|---|---|---|---|---|---|---|---|
| 2589 | 13 | Horses. | $ c. | $ c. 23 \| 20 | | 23 \| 20 | |
| Totals.... | | | | | | | |

; N. B.—This ticket is to be delivered up at the place of destination; in default of which the stock herein named will be detained, and will remain at the owners risk and expense.

W. CUNNINGHAM, Station Agent.

[The reverse side contains the same conditions as in the above.]

And that simultaneously with the execution thereof, and at about 4 o'clock P. M., plaintiff delivered to the defendant, a common carrier, on board the car mentioned therein, thirteen horses, the property of the plaintiff, also mentioned in said agreement, in good condition, and paid the sum as freight therein charged, on said horses, from Stratford aforesaid, to Buffalo, in the state of New York, and defendant accepted said freight and received said horses.

That the car in which the plaintiff's horses were loaded, was, as soon as they were put into it, locked up by the defendant's agent, who took the key thereof, and said car remained locked, and the key thereof in the possession of defendant's agents, until it arrived at Buffalo.

That on the same day, but after the usual and declared time for said train to leave Stratford aforesaid, the train of which this car constituted a part, started from Stratford and arrived at Brantford, Canada West, on its way to Buffalo aforesaid, at about five o'clock in the morning of the 16th day of March. That the train, when it so arrived at Brantford, was composed of cars, some of which were loaded with produce and dead freight, and others with live stock, including plaintiff's horses. That at Brantford aforesaid, said train was broken up by the servants of the defendant, and the cars containing the live stock, including the one containing the plaintiff's horses, were placed upon a switch, or side track, while the cars containing produce and dead freight, were made up into a new train, to which the engine, after

being detached from the stock cars, was hitched, and proceeded to Buffalo, leaving the cars laden with live stock, including the car containing plaintiff's horses, standing upon the switch or side track, at Brantford aforesaid, until between 10 and 11 o'clock on the morning of the 18th March, when the cars laden with stock, including the car containing plaintiff's horses, were sent by defendant to Buffalo, arriving at that place on the 19th day of March, about noon, when defendant delivered said horses to plaintiff—they having been without food or drink since they were loaded at Stratford aforesaid.

That while said car, containing plaintiff's horses, remained standing on the side track at Brantford, and soon after the arrival of the train from Stratford, all the employees of defendant, who had been connected with this train departed, none of them remaining in charge of the live stock, except that there remained at Brantford a local yard master, and a local station agent, employees of defendant.

That other trains afterwards arrived at Brantford, from points west of Brantford, composed of cars loaded with produce, and others loaded with live stock, all of which trains, on their arrival, were broken up by defendant's employees, and the cars containing live stock were placed on side tracks of defendant's road, while the cars containing dead freight and produce, were made up into new trains and sent on from Brantford to Buffalo by defendant's employees. That while the cars containing plaintiff's horses, remained at Brantford, a large number of trains loaded with dead freight and produce, estimated at from ten to fifteen trains, came from points west of Brantford, on defendant's road, and passed by the car containing plaintiff's horses while standing on the side track, and went on towards Buffalo.

That while thus detained at Brantford, plaintiff frequently, on the 17th and 18th days of March, applied to the yard master at Brantford aforesaid, and to Mr. Evans, the station agent at Brantford, to have the car containing plaintiff's horses unlocked and unloaded, to the end that the horses could be properly fed and watered, as they could not be fed

and watered while in the car, which the said agents of defendant declined to do, or permit to be done.

That plaintiff could have no access to his horses while locked up in the car, and until they were delivered in Buffalo.

That by reason of being detained without food or drink, and by and through the gross and culpable negligence and misconduct of the servants of the defendant having charge of the defendant's trains and stations upon that branch of the defendant's road, the said horses were damaged to the amount and in the manner stated in the complaint, i. e. nearly starved to death and rendered nearly valueless.

The usual time of running stock cars from Stratford to Buffalo over defendant's road, was from 24 to 26 hours.

The plaintiff thereupon rested his case.

Defendant's counsel moved the court for a nonsuit.

The court decided that the liability of the defendant must be determined by the laws of the state of New York, and granted the motion, and plaintiff's counsel duly excepted.

And the court directed the exceptions to be heard at the general term in the first instance, and until the hearing and decision thereof that the entry of judgment be stayed.

> MANN & COTHRAN, attorneys, and
> GEO. W. COTHRAN, counsel for plaintiffs.

I. The special contract does not exonerate the defendant from damage to plaintiff's horses occasioned by the negligence or misconduct of the defendant's servants or agents. (Wells agt. The Steam Navigation Co. 4 Seld. 375; Powell agt. Penn. R. R. Co. 32 Pa. State R. 414; Goldey agt. Penn. R. R. Co. 6 Casey's Pa. R. 242.)

1. The defendant is a common carrier, and may lawfully contract for a restriction of, or exemption frome some of its common law liabilities.

How far, and as to what particular liabilities, has the defendant relieved itself by the contract in question? which is as follows; "The owner * * * undertakes all risk of

loss, injury, damage and other contingencies, in loading, unloading, conveyance or otherwise;"

That the plaintiff never intended to confer upon the defendant, and that the defendant did not seek to have the right conferred upon it to starve these horses, is manifest upon the face of the contract. It is apparent that no such contingency was contemplated by the parties.

Both parties were undoubtedly aware that a variety of accidents might, and frequently do happen, in loading, unloading and conveying live stock, for which the defendant would be liable to respond in damages, such as arise from the accidental displacement of a rail in the track; the breaking of a car wheel and other similar causes; in other words, the ordinary incidents of railroad conveyance; and it was as against injuries sustained from such causes that the plaintiff agreed to assume the risk. To hold that the plaintiff assumed the risk of loss, injury or damage occasioned by some extraordinary event, clearly not contemplated by the parties when the contract was made, and that too transpiring while the horses were neither being loaded, conveyed or unloaded, but while standing on a side track of defendant's road, is to make a contract for the parties, and not to place a construction upon the contract which they have made.

2. This clause relates solely to accidents and casualties happening without the negligence or misconduct of the defendant or its employees. It has nothing to do with damages arising from negligence or misconduct. Those words do not occur in it; nor is there a word in it from which it can be even inferred that the defendant has exonerated itself from damages thus occurring. The plaintiff has in no way waived his right to ask the defendant to respond in damages for injuries caused by the negligence or misconduct of defendant or its employees.

The contract itself furnishes indubitable evidence of this.

The third paragraph, by which the defendant sought exemption from liability to persons riding on free passes, in express terms exonerates the defendant from responsibility

for injuries occurring by means of the "negligence, default, misconduct or otherwise, on the part of the company, &c."

It is a well understood principle in the construction of contracts, that where a party seeks exemption from liability in reference to several subjects embraced within the same instrument, and the exemption is expressly made as to one of the subjects, and is omitted as to the other subjects, and the different subjects are entirely distinct from and independent of each other—the fact that this exemption is thus made in one case, and not in the others, excludes the idea that such exemption was sought, intended or made, as to the other subjects.

If the defendant had intended to have relieved itself from liabilities in loading, unloading and conveying these horses, resulting from the same causes, particularly specified in the third paragraph, it would have employed the same or synonymous terms in creating this exemption ; and the fact that it did not, is conclusive that no such exemption was intended or made. Why make this express exemption in the one case and not in the other, if a distinction was not intended to be made between the two cases?

It is well known that every time one of these contracts are foisted upon a person by a railroad company, that the company is guilty of a moral fraud. These contracts are in the highest degree coercive. The community, especially in Canada, is at the mercy of these corporations. The companies say sign that contract, or we will not take your property, and the party has no other alternative but to sign and take the chances. Were he to sue the company for refusing to receive his property, the company would be ready with a defense of some kind, for whoever knew of an instance where such a company was ever wanting in defenses or evidence to sustain them.

It is therefore, the duty, as we are persuaded it will be the pleasure, of this court, to construe this contract most strictly against the defendant, that it can consistent with the plain import of its terms.

3. To relieve a common carrier from its common law lia-

bilities, the exemption must be specific and distinct, and will not be implied from general expressions, which are susceptible of another construction. (*Wells et al.* agt. *The Steam Navigation Co.* 4 *Seld.* 375; *Alexander* agt *Greene*, 7 *Hill*, 533.)

*Wells* agt. *The Steam Navigation Co.* was an action to recover damages for injury to the cargo of a canal boat which was sunk on the Hudson river while being towed by the defendant's steamer, under a contract, by which the boat was to be towed " at the risk of the master and owners thereof." The court, per MASON, J., says : " In this contract, nothing is said about negligence. The parties undoubtedly had reference to those perils of navigation which were not the result of the contractor's own negligence when they provided that the boat should be towed at the risk of the master and owners " (*p.* 379), and again (*p.* 380), " and is certainly much more reasonable to infer that when they declare that the boat should be towed at the risk of the owners, they intended such risks as were incident to the navigation when proper care and skill were exercised, rather than risks to which it might be exposed by the negligence of the persons in charge of the steamboat. \* \* \* As there were risks of the navigation to which the special clause in the permit (the special contract) may naturally be applied, and more consistently with honesty and fair dealing than if extended to the negligence of the defendant, it is undoubtedly the duty of the court so to apply it. Such a construction is consonent with the probable intentions of the parties. I think the decision of the late court of errors, in *Alexander* agt. *Greene* (7 *Hill* 533), is conclusive upon this question."

While the court of appeals in *Wells* agt. *The N. Y. C. R. R. Co.* (24 *N. R.* 181), have declared that the distinction theretofore made between different degrees of negligence no longer exists, it distinctly affirms the doctrine of *Wells* agt. *The Steam Navigation Co.* And consult, as to the same point (*Bissell* agt. *The New York C. R. R. Co.* 25 *N. Y.* 451).

Would it have enlarged or restricted, or at all affected the defendant's liability, in the case quoted from, had the term

" all the risks " been used, instead of " at the risk of the master and owners thereof ?" In either case the meaning is precisely the same ; the boat was to be towed at the owner's risk. And this case settles the question that a boat towed, or a car load of horses conveyed, at the owner's risk, does not affect the carrier's liability occasioned by the negligence of his employees.

The exemption in that case was more extensive than in this. There the boat was to be taken from one end of the route to the other, " at the risk of the master or owner," while in this case the owner simply " undertakes all risk in * * * loading, unloading, conveyance or otherwise." This phrase " or otherwise," is meaningless (*See Wells* agt. *The N. Y. C. R.R. Co.* 24 *N. Y.* 184). Should the court hold that it in any manner enlarged or qualified the defendant's liabilities, its signification is nevertheless subordinate to and controlled by the term " risk."

. 4. This contract does not cover an injury which occurred after the horses were loaded, and while the car containing them was standing still on a " switch " of defendant's road, where it was placed, not as an ordinary or necessary incident to the performance of the contract, but, as the exceptions show, for the purpose of making an unjust and unfair discrimination in favor of dead freight, as against live stock. The conduct of the defendant as exhibited by the exceptions—and but a portion of the case appears in them—is of the most gross and flagrant character conceivable. And to shield the defendant from the consequences of this iniquitious misconduct, it will be necessary for the court to hold, that when the parties made this contract, they intended that the defendant might practice this disgraceful and outrageous cruelty on these horses, and not be responsible for it ; for the contract is to be interpreted by the court as it was understood and intended by the parties. And, if the defendant coerced the plaintiff into a contract that by means of some latent trick, chicanery, " or otherwise " embraced within the ambiguous phrase, " or other contingencies," by means whereof an unconscionable advantage has been sought, the

court should rebuke such unfair mode of procedure, and construe the contract in the most liberal manner in favor of the plaintiff.

5. This contract, neither by express terms nor fair implication, embraces exemption from liability occasioned by the misconduct of the defendant or its employees.

Amplification to any extent, cannot make this proposition stronger or more definite. It demands the exercise of but a modicum of common sense in construing this contract, to discover its force and truthfulness. It is quite unnecessary to appeal to adjudications after the explicit determination in the case of *Wells et al.* agt. *Steam Navigation Company*, that this contract furnishes no immunity from liability created by negligence, a much less grade of culpability than misconduct. If the rule of *stare decisis* is not obsolete, it must apply here.

*Bissell* agt. *The New York C. R. R. Co.* (24 *N. Y.* 442), *Wells* agt. *The Same* (24 *N. Y.* 181), and *Perkins* agt. *The Same* (24 *N. Y.* 196) are all cases to recover damages for injury to persons riding on free passes, or rather special contracts, whose language included an exemption from liability from whatever cause. The court held the contracts valid, and that the terms of the contracts relieved the company from liability resulting from the negligence of the company's servants. By reference to the contracts in those cases, it will be seen that they are very different from that under consideration.

So in *Lee* agt. *Marsh* (43 *Barb.* 102), the contract in terms relieved the defendant from all liability that was not created by willful negligence or fraud.

There is no reported case that holds that such a contract as this relieves the defendant from the consequences of the misconduct of itself or of its employees. The counsel for defendant, at the trial, relied much upon several Canadian and English authorities. A brief glance at them shows a very different state of things from what the counsel claimed.

The only question in *Bates* agt. *The Great Western Railway* (1 *U. C. Law Journal, N. S.* 319), and which was raised

Heineman agt. The Grand Trunk Railway Co.

by demurrer, was whether the company had power to contract for a restriction of its common law liabilities. The court held it had.

In *Hamilton* agt. *The Grand Trunk Railway* (23 *Q. B. U. C.* 600), the court held that the defendant might, by special contract, relieve itself from the gross negligence of its servants.

*Spetigue* agt. *Great Western Railway* (15 *U. C. Com. Pleas* 315), is to the same point.

*Sutherland* agt. *The Same* (7 *U. C. C. P.* 409), relates to damages for injury to passengers, and has nothing to do with this case. Demurrer.

In *Woodruff* agt. *The Same* (17 *Q. B.* ), the same question was involved as in *Sutherland's case*. A special contract was interposed as a defense, and was demurred to, and the validity of the contract sustained.

*O'Rorke* agt. *The Same* (23 *Q. B. U. C.* ), really settles no question. The plaintiff in that case stipulated to relieve the defendant from liability, " whether arising from the negligence, default or misconduct, criminal or otherwise, on the part of the defendant or of their servants."

*Van Toll* agt. *South Eastern Railway Co.* (104 *E. C. L.* 186), decides that where a person deposited a bag in the defendant's cloak room, under a special contract, the defendant received it as ordinary bailee, and not as a common carrier.

*Crouch* agt. *The London and Northwestern Railway* (78 *E. C. L.* 254), has nothing whatever to do with this case.

In *White* agt. *The Great Western Railway* 89 *E. C. L.* 7), in the language of the court, " the question is one of mere special pleading."

*Austin* agt. *The Manchester. Sheffield & Lincolnshire Railway* (70 *E. C. L.* 453, *S. C.* 11 *Eng. Law and Eq.* 518), instead of being an authority for the defendant, it is an explicit and decisive authority in favor of our proposition. It was an action to recover for the killing of a horse while being conveyed under a special contract, as follows : " This ticket is issued subject to the owner's undertaking to bear

all the risk of injury by conveyance and other contingencies; and the owner is required to see to the efficiency of the carriage, before he allows his horses or live stock to be placed therein; the charge being for the use of the railway, carriages and locomotive power only, the company will not be responsible for any alleged defects in their carriages or trucks, unless complaint be made at the time of booking, or before the train leaves the station; nor for any damage, however caused, to horses, cattle or live stock, of any description, traveling upon their railway, or in their vehicles."

The horse was killed by reason of the servants in charge of the train, neglecting to properly grease one of the axles, which took fire and the wheel broke. Plaintiff had a verdict, and on motion to arrest the judgment, the court, per CRESSWELL, J. said (p. 473): "The question to be considered then is, what was the true nature of the contract entered into between the parties in this case? The ticket, which contains the terms of the contract, was issued "subject to the owner's undertaking to bear all the risk of injury by conveyance or other contingencies." If this had been the only passage applicable to the risks to be borne by the owners, it might have been contended, on their behalf, that it did not extend beyond injuries sustained by reason of a journey by railway simply, or by means of some accident; and that it would not protect the carriers from the consequences of negligence on the part of themselves or their servants. But the ticket further states that "the company will not be responsible for any damages however caused, to horses, &c.," and the court held that the accident by means of which the horse was killed, was covered by the express terms of the contract; and arrested the judgment.

After conceding the power in the defendant to limit its liability by contract, it is impossible to see why the contract did not relieve the defendant in that case. But just compare that contract with the one under consideration in this case.

The first clause in that contract is substantially the same as the clause in question; and the court very pointedly

determined that it applied merely to the ordinary incidents of railway conveyance.

The court, however, went further and said, " but there is nothing in this declaration amounting to a charge of misfeasance or renunciation of the character in which the defendants received the goods." * * * The question, therefore, still turns upon the contract, which in express terms exempts the company from responsibility for damages, however caused, to horses, &c. In the largest sense, these words might exonerate the company from responsibility, even for damage done willfully, a sense in which it was not contended that they were used in this contract."

The court plainly intimates that the contract would not have exempted the defendant from misfeasance, had that issue been made by the pleadings. That issue is joined in this action.

And this is the leading case, settling the law of Canada, as was claimed by the defendant's witnesses and counsel on the trial.

But it is unnecessary to pursue the argument further. While common carriers may relieve themselves from the consequences of the negligence or misconduct of their servants, the defendant has utterly failed to secure such exemption by this contract.

II. A railroad corporation cannot, by contract, exempt itself from liability for damage resulting from its own misconduct or recklessness, which is equivalent thereto. (*Perkins* agt. *The N. Y. C. R..R. Co.* 24 *N. Y.* 196; *Bissell* agt. *The N. Y. C. R. R. Co.* 25 *N. Y.* 446.)

In these cases it is recognized as the law that a railroad company may relieve itself from liability occasioned by the misconduct or negligence of its subordinate servants or agents, the question being yet unsettled what servants or agents, if any, are to be regarded as so directly representing the company, that such a contract may not be made.

This case is relieved from any embarrassment in that respect. The contract under which the defendant claims

exemption from its common law liabilities was made on behalf of the defendant by a " station agent."

After the horses had arrived at Brantford, all the employees of defendant who had charge of the train in which these horses were conveyed departed, leaving the defendant's station agent and yard master, at Brantford, the only persons in charge of the defendant's property at that station.

To these parties plaintiff applied to have his horses unloaded, or for permission to unload them himself, in order that they might be fed and cared for, as they could not be fed while in the car, but both station agent and yard master refused to unload them, or to permit them to be unloaded. The injury complained of was the result of this refusal.

If a "station agent" so nearly represented the company as to bind it by his contracts, as it is conceded he could and did do in this case, why did not the "station agent" at Brantford have equal power to bind the defendant by his refusal to permit these horses to be fed and nourished?

The common law, independent of any statute, imposes upon the defendant the duty to keep some competent person. in charge of all property intrusted to its care for transportation; and in the absence of the parties immediately in charge of the train, the "station agent being the principal employee of defendant present, had charge of all the company's property at that station.

The same power that made the contract was evoked to save these horses from injury. If the defendant's counsel desires to take the position that the acts of a station agent do not bind the company, we will agree with him and pronounce the contract void, and ask the defendant to respond on its common law liabilities. And if he takes the ground that the station agent has the power to bind the company, we will agree with him again, and ask the defendant to pay the damages occasioned by the misconduct of the station agent. Which horn of the dilemma will the counsel take?

III. The laws of the state of New York control the construction, interpretation and validity of this contract. It was in this state where the contract was to be performed

(*Jewell* agt. *Wright*, 27 *How. Pr. R.* 481, *and cases cited in brief of appellant's counsel*).

The law on this point, is no longer open for discussion in this state.

The conveyance of the horses over the defendants road was a mere incident to the performance of the contract which consisted in the delivery of the horses in Buffalo to the plaintiff.

But we have shown that the plaintiff is entitled to recover under the laws of England, of Canada, as well as under the laws of this state. There is no real difference in the principles enunciated by the authorities in the different countries, the sworn opinions of several of our professional Canadian brethren to the contrary notwithstanding.

IV. The nonsuit should be set aside and a new trial ordered, costs to abide event.

SPRAGUE and FILLMORE, *for defendant.*

I. By the law of England, Canada, and of the state of New York, a railroad corporation may, by special contract (unless prohibited by statute), exempt itself from responsibility for injuries to property transported by it, occasioned by the gross and culpable negligence and misconduct of its employees, including that willful misconduct which consists in the intentional neglect of a known duty, and which is known in the law as willful negligence. (*Wells* agt. *Steam Navigation Company*, 2 *Comst.* 204 ; *Dorr* agt. *N. J. Steam Navigation Company*, 1 *Kern.* 485 ; *Opinion of* GARDNER, J. *in Wells* agt. *Steam Navigation Company*, 4 *Seld.* 375 ; *cited and approved in Wells* agt. *N. Y. C. R. R. Co.* 24 *N. Y.* 196 ; *Smith* agt. *Same, Id*, 222 ; *Bissell* agt. *Same*. 25 *N. Y.* 442 ; *Stinson* agt. *Same*, 32 *N. Y.* 337.)

As to the English and Canadian authorities, see as examples the cases cited hereafter under other points, in which the same doctrine is either stated or assumed to be the law.

II. By the contract in question (being clause No. 1 of the written instruments under which the property was trans-

ported), the plaintiff assumed all risk of injuries resulting from the neglect, both ordinary and gross, of the servants of the defendant, and from that misconduct of its servants for which, in the absence of a special contract, it would have been responsible ; that is misconduct not amounting to a willful trespass.

*First.* The clause in question is the plaintiff's contract, and is therefore to be construed favorably to the defendant ; it is also to be construed so as to make all its words, as far as possible, effectual, and with the aids afforded by surrounding circumstances, and by our knowledge of the objects of the parties.

*Second.* As to the circumstances of the parties and the object of the contract.

*(a)* It was understood between the parties at the time the contract was made, that the defendant was not responsible for the acts or neglects of the plaintiff or his agents, nor for inevitable accidents. The only things therefore against which it was necessary for the defendant to guard itself by special contract, were accidents resulting from the acts of third persons, the acts of its employees occurring without fault, and the neglect and misconduct of its employees. It is submitted that railroad accidents resulting from the acts of third persons, or without fault on the part of the employees, to property in the course of transportation are so rare, that it would be unreasonable to suppose, that the chief object of this contract was to guard against them. Its intent then was, among other things, to protect the company against the consequences of the neglect and misconduct of its servants. This was substantially all that it was important for the company to protect itself against by a special agreement.

*(b)* By the clause in question, the owner, among other things, takes " the risk of loss and other contingencies in conveyance." It was well understood that one of those risks was delay and consequent lack by the animals of food and drink, and neglect and misconduct by the defendant's employees in those respects. There is therefore no more reason for excluding these risks from the operation of the

contract than any other risks. The parties make no such exception, and the law will not alter their contract.

(c) The question between the parties was in general who should take the risks of the journey. In consideration of the freight charged, the plaintiff assumed the risks. There is nothing to show that the minds of either of the contracting parties were drawn to the consideration of the difference between different kinds of risk. Possibly, had his attention been called to it, the plaintiff would not have made a contract by which he took the risks of the misconduct of the defendant's employees; but there is nothing to show that the parties did in fact contemplate any exception whatever to the risk assumed by the plaintiff.

(d) If the injury had been the result of some slight neglect or misconduct of one of the employees of the defendant, it is believed, that the position of the defendant would not be seriously controverted. The objection consists in the gross character of the neglect and misconduct complained of. But if by the contract the defendant is relieved from one degree of misconduct he is from another. No distinction is made by its terms; and the law recognizes no distinction under which we can say that a contract covering negligence and misconduct at all, does not include their grossest as well as their slightest degrees. (*See Perkins* agt. *N. Y. C. R. R. Co.* 24 *N. Y. R.* 206; *also Smith* agt. *Same, Id. p.* 242.)

(e) Suppose that the defendant by its charter was only responsible for such liabilities as it should assume by special contract, and that it had entered into this contract assuming the risk in question, would there be any doubt that one object was to protect the plaintiff against the gross misconduct of the defendants employees? But in the case at law the plaintiff assumes the same liabilities.

(f) In substantially the language of SMITH, J. in *Perkins* agt. *N. Y. C. R. R.* (24 *N. Y.* 203), it was known to the parties that the business of the company was to be performed by agents, some of whom would be negligent, and some of whom might misbehave, in despite of the utmost care in their employment. Parties are assumed to know this.

Knowing this, the plaintiff assumed the risks of the trip; unless there was an exception to the contrary, this would naturally include all degrees of negligence of the defendant's agents.

(g) In the language substantiully of ALLEN, SELDEN and GOULD, Justices, in *Smith* agt. *N. Y. C. R. R.* (24 *N. Y. R. p.* 239), there is no public policy which requires a railroad company always to be responsible for the gross misconduct of its employees. A party may if he please become his own insurer; and if the terms of the contract on a reasonable construction make him so, there is no reason why we should not suppose that such was his intention.

(h) In the language of Chief Justice BRONSON, quoted in *Alexander* agt. *Green* (7 *Hill*, 533), "whatever pains the defendant might take, losses might happen through the neglect or misconduct of the captain or hands" (the defendant's servants). These, as well as other risks, were to be borne by some one, and it was competent for the parties to agree who should bear the hazard. Here the parties settled the matter. They agreed that the vessel should be towed at the risk of the owner. It is impossible to say that the contract points to one kind of risk more than another, and if it does not cover all the perils of the voyage it means nothing." Although the chief justice was overruled in the particular case in which this opinion was delivered, yet his resoning bears upon the question of the intention of the parties, and shows that there is nothing unreasonable in supposing that the parties intended to relieve the defendant from responsibility for injury to the property, although caused by the culpable negligence and misconduct of its employees.

*Third.* There being then nothing unreasonable or unnatural in a contract by which a party shipping property assumes the risk of the misconduct of the employees of a railroad corporation, it is submitted that such is the reasonable interpretation of the clause in question.

(a) Had the assumption of risk been expressed in the most general terms, to wit, that the property was shipped "at the risk of the owner," that risk as between the shipper

and a railroad corporation would exempt the latter from liability for the negligence of its employees. The term "risk" in its popular sense, includes every hazard, however caused. So in the law of insurance, it covers losses by the gross and culpable misconduct and negligence of the agents of the insured (*Phillips on Insurance*, vol. 1, §§ 1049, 1096, *and cases cited*). The cases of *Schiffelin* agt. *Harvey* (6 *J. R.* 180), *Alexander* agt. *Greene* (7 *Hill*, 533), were decided before the distinction between the liability of a party for his own neglect and that of his agents, and especially the agents of a corporation, who cannot be under the personal inspection of its directors, had been discussed or established; and in the light of that discussion, and as applied to corporations, the arguments of Chief Justice BRONSON, and of HILL, *arguendi*, seem unanswerable. Neither those cases nor the case of *Wells* agt. *Steam Navigation Co.* (4 *Seld.* 375,) are in point in an action against a corporation. See also the criticism of the case of the *New Jersey Steam Navigation Co.* agt. *Merchants' Bank* (6 *How. U. S. C. R.* 344); in *Smith* agt. *N. Y. C. R. R.* (24 *N. Y. R.* 250). *Wells* agt. *Steam Navigation Company*, was put by Justice MASON upon the ground that it would be highly improbable that a party would seek by agreement to be relieved from his own gross neglect; a ground which has no application to a corporation and the neglect of its agents. It is impossible to say upon what ground *Alexander* agt. *Greene* was decided (*See Justice* BRONSON's *criticisms of this case in Wells* agt. *Steam Navigation Company, as decided in* 2 *Comst. p.* 208).

In England it is held that this general clause includes the gross negligence of the employees of the carrier. *Leeson* agt. *Holt* (1 *Stark. R.* 186), approved by SELDEN, J. (24 *N. Y. R.* 215); and it has been lately so decided in Canada in an action against a railroad corporation. (*Sutherland agt. G. W. R. R. Co.* 7 *U. C. P. R.* 415; *see also Stinson* agt. *N. Y. C. R. R. Co.* 32 *N. Y. R.* 333, *which sustains the same doctrine.*)

*(b)* But the cases cited of contracts where property was shipped "at the risk of the owners," were decided upon

the peculiar and very general terms of the contract, and throw very little light upon the construction of the contract in question. (*See opinion of* GARDINER, *J. in Wells agt. Steam Navigation Co.* 4 *Seld.* 375; *also opinion af* ALLEN, *J., concurred in by* SELDEN *and* GOULD, *Justices, in Smith agt. N. Y. C. R. R.* 24 *N. Y. R.* 251.)

*(c)* In construing this clause and distinguishing it from the words "property at the owner's risk," effect should be given in the first place to the word "all." See Senator POR-TER'S opinion in *Alexander* agt. *Greene* (7 *Hill*, 559), where weight is given to the distinction between "the risk" and "all risk;" also Justice WRIGHT'S opinion in *Smith* agt. *N. Y. C. R. R. Co.* (24 *N. Y. R.* 227). Taking "all risk" of loss is equivalent to taking the risk of "all losses," however caused. So the terms "loss, injury and damage," include all kinds of loss, &c., without restriction as to cause. So effect should be given to the word "contingencies." This does not mean damage to the property. That is already provided for. If the word "accident" were employed in its stead, it would clearly refer to the cause of the injury. But the word contingency is broader than accident. It includes everything that may or may not happen, through the result of gross and deliberate misconduct. This is its legal as well as popular signification (*See Bouvier's Law Dic.* "*Contingent*").

So the term "conveyance" signifies "while being conveyed," and the clause was intended to cover all losses occurring during the conveyance of the property, without restriction as to its cause. The word "otherwise" is at least equivalent to the words "in any other manner," which would include losses by neglect. If it does not, it means nothing, and might as well be stricken from the contract. Taken in connection with the rest of the clause, the meaning is that the plaintiff takes the risk of loss, "however caused," and that the defendant would not be responsible under such a clause, is settled by authorities which will be cited hereafter. Again, if the clause stopped at the word "contingencies," the construction might be doubtful; but upon the

plaintiff's construction the rest of the clause is meaningless and inoperative. Finally, it is submitted that it is apparent from the whole clause that the plaintiff intended to assume the risks incident to the trip; and it is not the province of the court to interpolate an exception, even if they believe that they would not have made such a contract had they been in the plaintiff's place.

*Fourth.* It is perfectly well settled by the English, Canadian and New York authorities, that where property is transported under a contract by which the shipper takes the risk of injury, however caused, this clause exonerates the carrier from responsibility for the gross and willful neglect and the misconduct of its employees; at least if the carrier is a corporation; and it is submitted with the utmost confidence, that such in substance is the legal effect of the contract in question. It will be noticed that in all the cases no distinction is made between contracts where the shipper takes the risk of injuries however caused, and cases where the carrier stipulates that he shall not be responsible for them.

(*a*) The Canadian authorities are *Sutherland* agt. *The G. W. R. Co.* (7 *U. C. Com. Pl. R.* 315); *Hamilton* agt. *Grand Trunk Railway Co.* (23 *Q. B. R. of Up. Can.* 600, 607, 609); *Bates* agt. *G. W. R. Co.* (1 *Law J. Up. Can.* 319); *O'Rourke* agt. *G. W. R. Co.* (23 *Q. B. Can.* 427); *Spetigue* agt. *G. W. R. Co.* 15 *U. C. Com. Pl. R.* 315), of which see particularly *Sutherland's case and Hamilton's case.*

(*b*) Among the English authorities, see *Leeson* agt. *Holt* ( *Stark. R.* 185); *Austin* agt. *Manchester, &c. R.* (70 *E. C. L. R.* 454); *Vantole* agt. *Southeastern Railway* (104 *E. C. L. R.* 75); *Peck* agt. *Northeastern R. Co.* (96 *E. C. L. R.* 957, *in Exchequer Chamber on appeal from the Queens Bench*); *White* agt. *G. W. R. Co.* (89 *Id.* 7); *Hughes* agt. *G. W. R. Co.* (78 *Id.* 637); *Chippendale* agt. *The Lancashire, &c. R.* (7 *Law and Eq. R.* 395); *Carr* agt. *Same* (14 *Id.* 340,) PARKE, B. saying, " we ought not to fritter away the meaning of contracts merely for the purpose of making men careful (*York, etc. Co.* agt. *Crisp.* 14 *C. B. R.* 527).

(*c*) As to the authorities in the state of New York, in

*Stinson* agt. *N. Y. C. R R.* (32 *N. Y. R.* 333), the agreement was that the owner should load, unload and *tranship* (*see p.* 337, not *transport* as the statement of the case reads) at his own risk.

The court assume that this would include every risk, incident to loading, unloading and transhipment. Had the clause read that the stock was to be loaded, &c., by the company at the risk of the plaintiff, the conclusion must have been the same. (*Bissell* agt. *N. Y. C. R. R. Co.* 25 *N. Y. R.* 442 ; *see opinions of* GOULD *and* SELDEN, *Justices ; Perkins* agt. *N. Y. C. R. R.* 24 *N. Y. R.* 196 ; *see opinion of* SMITH, *Justice.*)

See opinion of SELDEN, J. in another case, title not given (24 *N. Y. R.* 207), based upon the supposition that the contract was simply that the plaintiff takes " the risk of injury however caused ;" and in the course of which he says, " our language affords no words more comprehensive than these. The agreement should be construed to exempt from every species of liability which the law will permit to be contracted against."

*Smith* agt. *N. Y. C. R. R. Co.* (24 *N. Y. R.* 222), on a careful examination will be found to have been decided upon the ground that the contract was not made with the plaintiff's intestate, that it was not valid as to a passenger for hire, and that, according to one of the judges, the furnishing of an improper car was an act of the corporation itself. The judges assume that the position taken by the defendant in this case is correct ; see particularly the opinions of ALLEN, SELDEN and GOULD (*p.* 239), in which they say that the contract " the person riding with the stock takes the risk of injury from whatever cause," was comprehensive and worded in the very terms of *Austin* agt. *The Manchester Railway*, and the *York*, &c. *Co.* agt. *Crisp*, cited above.

*Fifth.* A railroad company is not responsible as a common carrier for the transportation of live stock, but only for actual negligence. To say therefore that the contract does not cover negligence, is to destroy its entire operation. (*See note 1, Am. Railway Cases, p.* 181).

*Sixth.* The property being transported under a special agreement, that only furnishes the rules by which the duties and liabilities of the parties are to be ascertained. The defendant is not responsible as a common carrier, but only by virtue of his contract; and the contract, it is submitted, does not make it responsible for the damages sustained by the plaintiff in this cause (*See note* 1, *Am. R. Cases,* 181).

*Seventh.* If a new trial is granted, the court is respectfully requested to intimate whether in its opinion the effect of the contract is to be determined by the laws of Canada or the laws of New York, as that question will probably arise upon such trial.

The contract in question was made in Canada, by a Canada corporation, for transportation, to be substantially performed in Canada. The delivery in Buffalo was a mere incident to the contract. The injuries complained of occurred while the property was being transported in Canada. Under these circumstances it is submitted that the question whether or not the defendant is responsible for those injuries is to be determined by the law of Canada.

For a citation of all the authorities as to the place of performance affecting the *legem loci,* see *Jewell* agt. *Wright* (30 *N. Y. R.* 259).

*By the court,* MASTEN, J. I understand it to be settled law in this state, at the present day, that railroad corporations engaged in the transportation of property are subject to the absolute responsibility which, by the common law, rests upon common carriers; they are, except as against loss or injury occasioned by the act of God or of a public enemy, insurers of the safe transportation and delivery of the property entrusted to them for carriage.

In the carriage of living animals, except as to those injuries which result from the vitality of the freight, and could not by care and diligence be prevented, they are bound to the same responsibility as in the carriage of inanimate property.

Common carriers cannot, by contract, shield themselves

from liability for their own fraud, or their own willful act or negligence, but they may contract against liability for that low degree of negligence or want of care on their part, which is not equivalent to willful or wanton neglect of duty or recklessness.

They may also, by special contract, relieve themselves from all responsibility for injury to or loss of the property entrusted to them occasioned by the negligence, misconduct, fraud or felony of their employees or servants.

When the carrier is a corporation, whose affairs are entrusted to the management of a board of directors, it cannot exempt itself from liability for the willful negligence, misconduct or recklessness of its board of directors. This rule does not extend to its subordinate agents or servants, and the weight of opinion seems to be that it does not extend to any officer or agent of the corporation other than the directors. (*Dorr* agt. *The New Jersey Steam Navigation Co.* 1 *Kern.* 485 ; *Clarke* agt. *Rochester and Syracuse Railroad Company*, 14 *N. Y.* 570 ; *Wells* agt. *The N. Y. C. R. R. Co.* 24 *N. Y.* 180 ; *Perkins* agt. *The N. Y. C. R. R. Co.* 24 *N. Y.* 196, 214 ; *Bissell* agt. *Same*, 26 *N. Y.* 442.)

The right of common carriers to restrict their liability to the extent above stated was, after some controversy, finally established in England, and it was the abuse of that right by carriers which led to the passage, in 1854, of "the railway and canal traffic act," by which this right was limited. (*Peck* agt. *N. S. Railway Co.* 16 *Eng. Com. Law R.* 1005 ; *Id.* 96 *Eng. Com. Law R.* 958, 986.]

As early as Lord COKE's time, it would seem that a common carrier could, by contract, restrict to a certain extent his common law liability (*Note, Southcoate's Case, Coke's R.* par. 4, *p.* 88).

But until within the last quarter of a century, the weight of authority in England and in this country, was that " the salutary policy of the common law " did not allow a common carrier, even by special contract, to shield himself from responsibility for the fraud, misconduct or gross negligence of his servants. And the law is so laid down by

Chancellor KENT and Judge Story in their commentaries. [2 *Kent's Com.* 608 ; *Story on Bailments*, § 549.]

But, as I have already said, it was finally established by the decisions of the courts in England and in this state, that the policy of the common law did not prevent the carrier from exonerating himself by agreement from liability for the negligence of his servants.

In view of the great extent to which the carrying business is monopolized in this country by corporations and combinations, and the power that they possess to dictate terms, it is quite probable that legislative interference will be successfully demanded, as has been done in England.

Indeed I see in the Civil Code, which has been reported by the commissioners, a provision that " a common carrier cannot be exonerated by any agreement made in anticipation thereof, from liability for the *gross* negligence, fraud or willful wrong of himself or his servants."

The commissioners have, I think, divided negligence into degrees too refined for practical purposes.

The injury to the plaintiff's property, for which this action is brought, was occasioned by the willful misconduct of the defendant's servants and against responsibilities for which it was lawful for the defendant to contract.

This brings us to the construction of the special contract of carriage between the parties.

The law being settled, the contract is to be construed according to the intent of the parties to be gathered from the language used, giving, if possible, some force and effect to every word made use of as evidence to some extent of their intent.

The contract is, " the owner of the within mentioned animals undertakes *all risk* of loss, injury, damage and other *contingencies* in loading, unloading, conveyance and *otherwise.*"

These words are very general and comprehensive. I do not see how we can say that they do not embrace all (every) risk (hazard, danger, peril, chance) of loss, injury, damage and other contingencies (casualties, accidents, occurrences),

in loading, unloading, conveyance and otherwise (other manner or way), which the plaintiff might lawfully take upon himself and the defendant lawfully throw off of itself.    If we undertake to limit these general and comprehensive terms, I do not see where we are to draw the line.    What have we to draw it by ?    If I knew of any way upon the principles by which courts must be governed to secure certainty or safety to suitors, to draw the line where the plaintiff contends it should be, I would be pleased to do so.

If we go outside of the writing to ascertain the intent of the parties as an independent fact, I think we would find that the defendant intended to get rid of all responsibility it lawfully could ; that to avoid responsibility for the carelessness, negligence and misconduct of its servants was prominently in view, and that the plaintiff was compelled to accept the terms dictated.

Judgment ordered for defendant upon the exceptions.

CLINTON, J., concurred.    VERPLANCK, P. J., dissented.