## KEENEY & BROWN *vs.* THE GRAND TRUNK RAILWAY COMPANY.

The defendant, a common carrier, received from the plaintiffs, at Goderich, in Canada, a number of cattle, upon its cars, under a special contract, by which it undertook to forward them to Buffalo, to the consignee, "subject to their tariff, and conditions expressed." In these conditions it was expressed that the owners undertook all risk of loss, injury, damage and other contingencies, in loading, unloading, conveyance and otherwise; and that the defendant did not undertake to forward the animals by any particular train, or at any specified hour, and was not responsible for the delivery thereof within any certain time, or for any particular market. The cattle were started the same day and taken a part of the distance, and had the cars containing them gone on, with the train, would have reached Buffalo the same night. Instead of this, the cars, when within sixty or seventy miles of that place, were by a positive and peremptory order from the defendant's freight superintendent, detached from the train and placed upon a side track where the cattle could neither be fed nor watered, nor with any safety be unloaded, and were there detained three or four days, and several of the animals perished from hunger and the inclemency of the weather, and others were greatly reduced in flesh, weakened and otherwise injured.

*Held*, 1. That according to the " conditions expressed " in the special contract, the defendant could not, in this manner, and for this length of time, suspend the performance of the undertaking it had thus commenced, without rendering itself liable to the plaintiffs for the damages occasioned by such suspension.

2. That the " conditions " did not extend to a case of damage arising from the deliberate and intentional act of the defendant, or its agents, in suspending performance after it had been commenced, and refusing to perform, or to allow performance, until after the property, or a portion thereof, had been destroyed, and other undertakings could be performed. In other words, that the defendant did not reserve to itself the right to perform or not as it might afterwards elect, or to perform only as it might suit its interests, convenience or pleasure.

3. That this was not a case of an injury arising from *negligence*, in any degree, but a case of an injury arising from a deliberate and intentional refusal to perform, for the time being, the undertaking of the defendant.

4. That such refusal by the defendant's freight agent, to perform the contract, was the act of the defendant, and the defendant was liable for the consequences, so far as his act or order had the effect to prevent performance, and thus create a breach of contract. And this, whether the agent was authorized to make the order or not.

Where the object of a contract is to relieve a party undertaking to perform a duty from some of the obligations and liabilities which the law imposes upon

Keeney *v.* Grand Trunk Railway Company.

him in the absence of any express stipulation, it is to be construed in reference to that object and purpose.

General expressions exempting a party from liability on account of injuries to property committed to his charge, should never be held to apply to injuries arising from the wrongful acts of the party undertaking, unless it is expressly so stipulated.

In every case where a party who has engaged to perform certain labor or services employs others to perform on his account, and such others, after commencing to perform, refuse to go on, or to allow the work to proceed, such refusal is the refusal of their employer; and if it amounts to a violation of the contract, it is the breach of the employer. Their misconduct, in such a case, is his misconduct, so far as it operates upon the contract and occasions non-performance.

A general carrier of freight has no right to discriminate, in forwarding freight, between different owners, in favor of one class, to the prejudice of others, by deliberately stopping or delaying the property of one person, in order to give a preference to that of another, contrary to the ordinary course of business.

It *seems* that the negligence, against liability for which, a railway company is not permitted to contract, must be confined to that of the board of directors, or, at all events, cannot be extended beyond that of those managing officers who make the general regulations, for the running of the trains and the transaction of the business of the road, for the government of others, binding upon all the subordinate agents. *Per* Talcott, J.

APPEAL by the defendant from a judgment entered upon the verdict of a jury.

The plaintiffs alleged, in the complaint, that the defendant was, and still is, a corporation duly incorporated under and pursuant to the laws of the Province of Canada; and was, and is, engaged in transporting freight and live stock over its road, and other railroads used, operated and controlled by said defendant, extending from Detroit, Michigan, to the city of Buffalo, in the State of New York, and through said Province of Canada, as a common carrier for hire. That, during the same time, the plaintiffs were copartners, and were, as such copartners, engaged in buying cattle in said province, and shipping them to the State of New York, for sale; and that on the 15th day of March, 1866, they delivered to the defendant, as such common carrier, at Goderich, in said Province, being a station upon

its said road, a large number of cattle, to wit, fifty-eight, consisting of dairy cows and oxen, which were accepted and received by said defendant, to be carried and transported by railroad from Goderich aforesaid, to the city of Buffalo; and the defendant, then, in consideration of the usual compensation therefor, agreed to be paid by the plaintiffs, did undertake and agree, as such common carrier, to carry and transport said cattle on its said railroad, or roads used and controlled by it, without delay, to the city of Buffalo, and there to deliver the same to the plaintiffs in good condition. That in pursuance of said agreement and undertaking, the defendant did receive and ship said cattle upon its cars, and on the same day started said cars containing said cattle for Buffalo, pursuant to said agreement and undertaking; and on the following day, to wit, on the 16th day of March, 1866, the plaintiffs delivered to the defendant, at Goderich, aforesaid, seventy-nine other cattle, which were accepted by the defendant, under said agreement, to be delivered to the plaintiffs in Buffalo, in like manner; and were, on the same day, shipped by said defendant, on its said road, for said city of Buffalo; but the defendant, in violation of its said agreement and undertaking, and of its duty and obligation as such common carrier, neglected and refused to transport said cattle to Buffalo; but that the defendant carried and transported said cattle to Brantford, a station between Goderich and Buffalo, and distant about sixty miles from Buffalo, at which place the defendant caused the cars containing said cattle to be detached from the train, and placed upon a switch, or side track, and detained the same on said side track a long time, to wit, two days and over, during which time the said cattle were without food or water; and the defendant would not permit said cattle to be taken from said cars to be fed or cared for. That the floor of the cars containing said cattle became frozen, and covered with ice, and slippery; and said cat-

tle, from their great hunger and thirst, and the condition of the floors, became useless and weak, and were thrown down upon each other, and were greatly bruised and injured, so much that a large number thereof were unable to stand upon their feet or to move, of which bruises and injuries, and from hunger and thirst, a large number thereof died, and were left at Brantford by the defendant, and were not delivered at Buffalo; and a large number of said cattle afterwards died of said injuries, and became worthless and of no value; and all of said cattle became, on account of such negligence and misconduct of the defendant, greatly injured and depreciated in value; and the plaintiffs were subjected to great loss and expense, and were obliged to expend large sums of money in doctoring and feeding said cattle, in endeavoring to cure and recruit the same, and fit them for sale or market; and that they had sustained damages to the amount of $2545, for which sum they demanded judgment and costs of suit.

The defendant, for its first answer and defense, admitted that it was a corporation, and engaged in the business of transportation, as alleged in the complaint. And denied that the defendant ever made the contract with the plaintiffs, alleged in the complaint; or that it had been guilty of any violation of any agreement with the plaintiffs, as is alleged in the complaint, or otherwise; or of any breach of duty or obligation to the plaintiffs, in the manner alleged in the complaint, or otherwise. And as to all the allegations of the complaint, not specifically admitted or denied to be true, the defendant denied that it had knowledge or information sufficient to form a belief in respect thereto, and it therefore controverted the same.

And for a second answer and defense, the defendant alleged that at or about the times mentioned in the complaint, certain cattle were shipped and transported over the road of the defendant, by, and for one Keeney, which the defendant believed to be the same cattle and the same ship-

ments described in the complaint; and that all of said cattle, and all cattle, stock, and animals of every kind, transported by the defendant for the plaintiffs, or either of them, during any of the times mentioned in the complaint, were delivered to the defendant, and the same were accepted and the transportation of the same undertaken by the defendant, under and in pursuance of an agreement and conditions entered into by the shippers and owners of the same with the defendant, by which the shippers and owners undertook all risk of loss, injury, damage and other contingencies in loading, unloading, conveyance and otherwise; and by which the defendant was not obliged, and did not undertake to forward the same by any particular train, or at any specified time; nor was the defendant to be responsible for the delivery of the same, within any specified time.

For a third answer and defense, the defendant alleged that it was a corporation existing under the laws of Canada, as alleged in the complaint; that its road lies in Canada; that it has no power to contract to carry property beyond the Province of Canada; that any injury done to any property of the plaintiffs, by the defendant's neglect, or otherwise by the defendant, was done while said property was being transported in Canada, and under a contract made in Canada for their transportation in Canada, and not elsewhere, and under the agreement and conditons in form and substance as before set forth. And the defendant further alleged, that by the laws of the Province of Canada such agreement and conditions were, in all respects, valid and binding; and that such agreement and conditions, under said laws, relieved the defendant from any liability whatever for any of the supposed matters set forth in the complaint.

And for a further answer the defendant alleged that at the times mentioned in the complaint, the defendant's road, and the roads employed by it, were, in all respects, in good order, and well equipped with cars, engines and other neces-

sary appurtenances for the performance of its business; and that it provided sufficient accommodation for the transaction of its business, under all ordinary circumstances; that all delay in the transportation of the plaintiffs' property was caused solely by an extraordinary press and accumulation of freight, which could not be provided against, caused by the anticipated termination of the so called Reciprocity Treaty between England and the United States, and by obstructions to the navigation of the Niagara river, and not by any negligence or fault whatever of the defendant.

The action was tried before Justice MARVIN and a jury, at the Wyoming circuit, in April, 1869.

The plaintiffs, to maintain the issues on their behalf, proved that they were the owners of the cattle mentioned, and that they were damaged by the delay at Brantford, herein after described, to the amount of the verdict rendered, as herein after stated. And further to maintain the action, they called as a witness Mattison Keeney, who testified as follows: " I reside in Warsaw, and did in 1866; I am one of the plaintiffs in this action; in 1866 I was bringing cattle from Canada, in company with John Brown; we were partners in the business; I shipped cattle on the 15th of March, 1866, two car loads ; there were about fifty head of cattle in both car loads; I came to Brantford with the cattle, one hundred and some odd miles from Goderich, where they were shipped ; they arrived at Brantford on the evening of the 15th of March, and they were there switched off, but not at my direction; Mr. Brown arrived the next day, about 9 o'clock in the forenoon, on the 16th of March; we had about one hundred and thirty head, in all three car loads ; Brown's cattle were also switched off; the engines were detached; the weather was stormy and bad, and the cattle were exposed; I could not feed, water or unload them; I think I asked to have them unloaded, and afterwards to have them carried on ; the agent, or "dispatcher," switched them; they were

started on about noon, March 18, for Buffalo; they arrived at Buffalo about 12 o'clock at night, on the 18th or 19th of March, 1866; they were unloaded in the forenoon of the 19th of March; they were loaded at 11 A. M., March 15th; they had not been fed or watered from the time they were loaded until they were unloaded; they were loaded in good condition; some of the cattle got down at Brantford, and we pulled seven head out of one car that were dead, or about dead; I have never seen anything of those cattle; I paid freight at Buffalo; I paid Hoover, the agent, regular rates; I think $33 in gold per car; the cattle were in a bad condition when they got at Buffalo; got all of them to the cattle yard except seven; I think three or four of them were pulled out at Buffalo, and left dead; the cattle left dead at Brantford were worth about $50 per head in gold, $350 in all; the three that were left on the platform at Buffalo were worth about $50, or more, $150 in all; I lost fourteen head in all, worth $50 each, on an average; dairy cows principally, a few oxen and a few heifers; I think we lost $15 per head on the balance, over and above the fourteen lost outright; had 130 head in all, fourteen of them were lost; 116, at $15 a head damage; I could not unload them at Brantford without getting to a shute, and I could not get to a shute; they were left on a switch, no engines attached to the trains; we could not feed or water them."

Being cross-examined, the witness further testified: "I had been engaged in buying and shipping cattle, more or less, for ten years; had shipped cattle over defendant's road at different times during two years; the defendant never paid us anything for the damage to the cattle; I received $68 for cattle sold at the yard in Buffalo."

The defendant's counsel then introduced in evidence two agreements, the signatures being admitted, being all printed, except the dates, signatures, number of cars and cattle, as follows:

Keeney *v.* Grand Trunk Railway Company.

"No. 123.              GRAND TRUNK RAILWAY.

LIVE STOCK TICKET.

15th March, 1866.

The Grand Trunk Railway Co. will please receive the undermentioned, consigned to M. Keeney, and forward to Buffalo, subject to their tariff and conditions expressed on the other side.

| No. of Cars. | Quantity. | Description. | Rate. $ cts. | Amount. $ cts. | Paid on $ cts. | Paid. $ cts. | To Pay. $ cts. |
|---|---|---|---|---|---|---|---|
| 2705 1759 514 | 58 | Cattle. | 32 60 | | | | 97 80 |
| Totals. | | | | | | | |

[On the other side of the above is the following:]

GRAND TRUNK RAILWAY.

CONDITIONS OF CARRIAGE.

I. The owners of the within mentioned animals *undertake* all risk of loss, injury, damage, and other contingencies, in loading, unloading, conveyance, and otherwise.

II. The railway company *do not undertake* to forward the animals by any particular train, or at any specified hour; neither *are they responsible* for the delivery of the animals within any certain time, or for any particular market.

III. When free passes are given to persons in charge of animals, it is only on the express condition that the railway company *are not responsible* for any negligence, default, misconduct, or otherwise, on the part of the company, or their servants, or of any other person whomsoever, causing or tending to cause the death, injury or detention of persons with such free passes; and that whether such passes are used in traveling by any regular passenger train, or by any other train whatever.

I agree to the above conditions.         M. KEENEY,

Owner, or on the owner's behalf."

It was admitted that the name " M. Keeney" was signed by the plaintiff Keeney.

The other contract (numbered 124) was in precisely the same form, embracing 79 cattle, and the conditions were signed by the plaintiff Brown. It was dated March 16, 1866.

It was also proved, that at the same time the defendant, by its agent, executed and delivered to each of the plaintiffs a contract, agreeing thereby to receive and transport said cattle from Goderich to Buffalo on the conditions expressed on the other side of said contract; that upon the other side of said agreements were printed conditions, as in said first mentioned agreements.

Cross-examination continued : " I bargained for transporting the cattle at so much a car; I was present when they were loaded ; I made the contract at the same time I shipped the cattle; I expected to pay regular rates; I went to the defendant's agent and told him I wanted to ship so many cattle ; I signed the agreement after the cattle were loaded on the cars; I left Goderich on the 15th of March, after dinner; I rode in rear car; at each station I saw the cattle ; arrived at Brantford Thursday night; I spent the night in the depot; did not go to bed; these cattle were switched off as soon, or nearly as soon, as I got to Brantford ; before I left for Buffalo, on the morning of the 16th, I don't think I spoke about their going on with the cattle; I hired a man and left him in charge of my cattle; I did not furnish him with any money; he was a man accustomed to taking care of cattle; Friday morning I went to Buffalo, and I think Saturday morning I went back to Brantford ; got there in the morning, and stayed there till the next day ; I did not do much the next day; Sunday, the 18th of March, I went again to Buffalo, and saw Mr. Hoover, and complained to him of the delay and detention of the cattle ; I did not go to see Mr. Barnard, at Fort Erie ; I saw Hoover both days,

on Sunday, and each day the cattle were on the switch at Brantford; the reciprocity treaty expired on Saturday, the 17th, and it was understood so with the agent, I supposed, and we talked that after that there would be a duty on the cattle, after Saturday; I knew there was considerable freight on the road; I was hurrying my cattle through before the expiration of the treaty; cattle had been prohibited from coming to the United States on account of disease, a short time before this transaction."

On his re-direct examination he testified: "It is customary for the owners of cattle to go on the cars with, and to look after them on the route; the defendant's agent refused to ship the cattle, unless I would sign the contract."

George H. Hoover was sworn as a witness for the plaintiffs, and testified as follows: "I resided in Buffalo during 1866; I was live stock agent of the Grand Trunk Railway Company at Buffalo; Barnard was the division freight superintendent of the road; he had charge of running trains; he had general authority to control running trains on that part of the road; his headquarters were at Brantford; I knew Keeney and Brown; their cattle arrived in Buffalo on the morning of the 19th of March; they were taken from the cars as soon as it was light; I received from the plaintiffs regular tariff freight for carrying the cattle."

On his cross-examination he testified as follows: "These passes are for allowing men to go down with their cattle; they are also good on passenger trains; cars are mostly slot cars, some of them are combination cars, with gratings; in shipping cattle, owners cannot procure the pass without signing the contract; can't say that they will receive cattle at all without signing such a contract; always give pass for one man to each car; I would not ship cattle without such contract being signed; I was familiar with the business of the company; I received $85 for plaintiff's cattle, which were sold by the defendant's agents, and

was instructed to pay it to plaintiffs, but before I saw them the order was countermanded; no cattle would be shipped on defendant's road without signing the printed conditions; the pass and conditions are together; no one could ship cattle without taking the pass to accompany them; the company gave one pass for every car, and would not ship on any other terms."

John Brown being sworn for the plaintiffs, testified as follows: "I am one of the plaintiffs in this action; I started with three car loads of cattle on the 16th of March, at about 11 A. M.; I had seventy odd head; they were shipped on defendant's cars at Goderich; we did not have quite as many as the bill showed; I think there was a mistake in counting them; there were 130 odd head in all; I reached Brantford at 9 P. M., March 16th; the cattle were switched at Brantford, without my consent or direction; there was no difficulty in going on from Brantford; there was no obstructions; I remained there from the 16th to the 18th of March; I did not go to Buffalo with the cattle; I reached Buffalo Sunday, 19th of March, after midnight; at Goderich I signed this paper, (being the second contract above mentioned;) the cattle were loaded before the paper was presented; the agent assisted me in loading the cattle; we were a little late about shipping our cattle; they said they would not ship the cattle unless we signed the paper; at Brantford we tried to have the cars switched so we could take out the cattle; the agent, Fenton, said he had orders to hold the stock; I tried to have the cattle moved off; I could not feed or water the cattle where they were; the cattle were getting down; it was cold at the time; at Brantford we pulled out some cattle that were dead, or nearly dead; I did not see the cattle in Buffalo, until they were at the yards; I first saw them on Monday at the yards; their condition was bad; the cattle should have been at Buffalo the next evening after they were shipped; they should have gone from Goderich to

Keeney *v.* Grand Trunk Railway Company.

Buffalo in 22 hours; the cattle, when put on board at Goderich, were store cattle—some fleshy, some cows; when they arrived at Brantford they were all in good condition, and not down; I got at Brantford the 16th of March, at evening, and was there that night and the next day, and left there and left the cattle with Mr. Allen; I took care of Keeney's and my own cattle at Brantford; all cattle cars were switched; trains were constantly running past with grain and lumber; while on the switch, German E. Allen helped me take care of the cattle; we did what we could to keep them up; we pulled out some dead ones."

On his cross-examination he testified as follows: "Cattle are not frequently kept in cars 48 hours, so far as I have shipped; the cattle came into Goderich a day, or a day but one, before they were shipped, and were fed there; we were in a hurry when we shipped them, the agent hurried us, as it was getting train time; my cattle left Goderich the day after Keeney's left; at Stratford we waited two hours for stock train from Sarnia; reached Brantford in the evening; I sat up that night with the cattle; next morning I saw Fenton, the freight agent, and asked him if he could get the cattle switched; I tried Saturday to get my cattle unloaded; I asked Fenton if the cattle could be switched so we could unload them; there was only one shute there; we did get one car down, and pulled out some dead cattle, then had orders to move on; I left the cattle there in Allen's charge; I came home, and went back Monday morning."

The plaintiff then read in evidence the following stipulation, signed by the defendant's attorneys: " It is hereby stipulated that it shall be admitted to be true, upon the trial of this action, without proof, that on the 16th day of March, 1866, J. F. Barnard, the local superintendent of the Grand Trunk Railway from Fort Erie to Brantford, at about the hour of 5 P. M. on that day, sent from Fort Erie to the telegraph operator of the company at Brantford, a

telegram, of which the annexed paper, marked "A," is a copy."

" A."

" March 16th, 1866.

Fort Erie operator, Brantford:

Austin must return from Fort Erie to Port Colborne, after arrival at Fort Erie, to clear out Port Colborne. The next special must bring forward from Dunnville all the cars that were left there from the wreck which may be able to run. Arrange for as many specials to-morrow as will clear up the flour, grain, beef and pork, keeping back all stock, staves and lumber. There will be no duty on stock. There is now a duty on staves, which will not be increased, and that on lumber is comparatively light.

(Signed)                    J. F. BARNARD."

The plaintiffs here rested their case, and the defendant's counsel moved for a nonsuit, upon the grounds that under the contracts aforesaid, the defendant was not responsible to the plaintiffs for the damage proved by them, and also upon the ground that no cause of action had been established by the plaintiffs; but the court denied the motion, and the defendant's counsel duly excepted.

Daniel McMichael was called as a witness for the defendant, and testified as follows: "I am a barrister and counsellor at law, residing at Toronto, Canada; have been practicing law in Canada for twenty years; where there is a special contract for the transportation of property between the shipper and the carrier, by the law of Canada, the carrier is not liable upon his common law duty as a carrier, but only upon the special agreement, and the rights of the parties depend exclusively upon the special agreement; by the law of Canada, a carrier may contract to relieve himself from the consequences of his own negligence, gross or otherwise, and such a contract is valid; when, by a contract with a carrier, the shipper undertakes all risk of damage to the property while in course of con-

veyance, such a contract, by the law of Canada, will exonerate the carrier from liability from loss occasioned by his own neglect, gross or otherwise, and his own misconduct; the law of Canada, in these respects, differs somewhat from that of England, which is governed, to a great extent, by statutes which have no operation in Canada."

Other witnesses were also examined on the part of the defendant.

At the close of the testimony, the defendant's counsel requested the court to direct the jury to find a verdict for the defendant upon the following grounds:

1st. That by the law of the State of New York, the defendant was not liable under the provisions of the contracts under which the cattle were transported.

2d. Upon the ground that, by the law of Canada, the defendant is not liable, and that the rights of the parties are to be determined by that law.

3d. That the only ground of action is the delay of the cattle by the defendant; and that this delay was not affirmatively proved to be owing to the neglect or misconduct of the defendant.

4th. Upon the ground that the evidence is undisputed, that all freight received was sent in the order in which it was received; and that the cattle were forwarded as soon as they could be, according to said order.

The court refused so to direct the jury, and the defendant's counsel excepted.

The court, after reading the contracts to the jury, charged them that the parties had a right to anticipate that the cattle trains would be run in the manner usual in that particular business, and that there should be no affirmative prejudicial discrimination against this species of freight; and that if such discrimination was made, to the prejudice and damage of the plaintiffs, the defendant was liable.

To this charge the defendant's counsel duly excepted.

The court further charged the jury, that ordinarily carriers should forward freight in the order of time in which it is received, making no prejudicial discrimination; that the defendant had no right to give preference to freight about to become dutiable, for that reason only, as against the freight in question.

The defendant's counsel duly excepted to that part of this charge wherein the court charged that the defendant had no right to discriminate in favor of freight that was about to become dutiable.

The court further charged the jury, that the law of Canada controlled the rights of the parties as to acts done or to be done in Canada, but at the same time charged the jury that it was for the court to construe the contracts under which said cattle were shipped; that by the construction which the court gave to the contracts, the said defendant would not be liable for the delay in question if it had resulted from the misconduct or negligence of what is ordinarily known as the employees of the defendant, but that the defendant was liable for damage arising from its own negligence or misconduct, or the negligence or misconduct of the witness Barnard, which were not in contemplation of the parties to the contract, as he was the freight superintendent of that part of the road over which the cattle were shipped, and was the managing agent and representative of the corporation itself, and in this respect differed from an ordinary employee, so that his neglect and misconduct was the neglect and misconduct of the company itself.

The defendant's counsel excepted to that part of said charge, wherein the court charged the jury that it was for the court to construe said contracts; also, to that part of said charge in which the court charged the jury that the defendant was liable for the negligence and misconduct of the witness Barnard; also, to that part of said charge in which the court charged the jury that the witness

Keeney *v.* Grand Trunk Railway Company.

Barnard was the representative of the defendant, and in that respect differed from an ordinary employee, so that his neglect and misconduct was the neglect and misconduct of the company itself.

The court further charged the jury, that the defendant could not contract to exempt itself from the consequences of its own negligence, and the defendant's counsel excepted; also, that the negligence of Barnard was the negligence of the defendant, within the meaning of this rule, and the defendant's counsel excepted.

The counsel for the defendant then requested the court to charge the jury that the defendant was not liable for any error of judgment on the part of said Barnard, but only for his actual neglect or misconduct, but the court refused so to charge, and the defendant's counsel excepted.

The jury rendered a verdict for the plaintiffs for the sum of $2325, for which sum, with the further sum of $113.19 costs, judgment was entered in favor of the plaintiffs, and against the defendant.

*E. C. Sprague*, for the appellant.

I. The contracts under which the cattle were shipped were valid contracts, made upon good consideration, and binding upon both the parties thereto. The contracts grew out of the peculiar character of the cattle transportation business. It is customary for owners to go with, and look after the cattle; they are not delivered like other merchandise into the exclusive keeping of the carrier. The defendant would not ship the cattle except under such a contract. Passes were given, allowing men to go with the cattle, which were also good on passenger trains; these passes could not be procured by shippers unless they signed the contract. The pass and contract go together; no one could ship cattle without taking the pass to accompany them; the company gave a pass for every car, and would not ship on any other terms.

Adding to this evidence the fact that the transportation of cattle by railroad is a business involving peculiar hazards, which has sprung up within a few years, and which the defendant, as a common carrier, was under no obligations, as will be shown more fully hereafter, to undertake, and there seems no reason why the contract should not be upheld, and receive the same construction as any other lawful agreement. The position is fully sustained by authority, in this State and in England. See *Heinèman* v. *Grand Trunk Railway Co.*, (31 *How. Pr.* 430,) where this precise contract is held to ˙be valid, and the cases cited by the plaintiffs' counsel. (*See also French* v. *The Buffalo, N. Y. and Erie·R. Co.*, 4 *Keyes*, 108 ; *Peek* v. *U. S. R. Co.*, 96 *Eng. Com. L.* 958, 986, *and cases cited.*)

II.· The defendant cannot be made responsible in this action for any breach of duty as· a common carrier, but only for a breach of the special contracts. 1. In England this would be so, because the general principle is there established that where the shipper, instead of relying upon the common law duty of the carrier, makes an express contract for the transportation of his property, he waives all claims against the carrier, by reason of his duty as such, and can only sue for a breach of his contract. (*Hamilton* v. *Grand Trunk R. Co., in the Court of Q. B., in Canada. Pardington* v. *South Wales Railway Co.*, 1 *H. & N.* 392. *Stewart* v. *London and Northwestern Railway Co.*, 10 *L. P. R. U. S.* 302 ; *and see note* 1, *Am. Railway Cases*, 181, *citing Shaw* v. *York &c. R. Co.*, 6 *Eng. R. Cases*, 87 ; *Austin* v. *Manchester &c. R. Co.*, 5 *Eng. Law and Eq.* 329 ; *Same* v. *Same*, 11 *id.* 506 ; *Carr* v. *Lancashire &c. R. Co.*, 14 *id.* 340 ; *Chippendale* v. *Lancashire &c. R. Co.*, 7 *id.* 395 ; *Morville* v. *Great U. Co.*, 10 *id.* 366.) But it is conceded that as to general merchandise this is not the law in this State, it being here held that the common law duty remains, excepting so far as it is varied by the contract. (*Simmons* v. *Law*, 3 *Keyes*, 217, *and cases cited.*) 2. The rule making

the common carrier liable for all losses, except such as are the result of the act of God and the public enemies, has no application to the transportation of cattle in the manner testified to in this case, and the rights of the parties must depend upon the terms of the contract. The reason of the rule was that the owner of the goods did not accompany them, so that they were exposed to the frauds of the carrier. This reason has no application to cattle accompanied by their owners or their agents. Besides, the carriage of cattle is no part of the common law duty of a railroad company or other carrier, who simply holds himself out to the public as a common carrier of merchandise. The business is novel, involving peculiar and great risks, and the rights of the parties must depend entirely on the contract they make in each particular case; and besides, there is no actual delivery of the cattle to the carrier for transportation, as there is in the case of other merchandise. There can be no question that a railroad company might refuse to transport cattle at all, and the evidence is that the defendant never held itself out as a common carrier of cattle, but simply gave the use of its cars, servants and track, under special contracts, to persons transporting their own cattle, and retaining the possession and care of them, except so far as that possession and care were limited by the contract. (*Allen* v. *Sackrider*, 37 *N. Y.* 341, *and cases cited. See particularly* 1 *Am. Railway Cases*, 182, *n. See also, Illinois Central Railway* v. *Morrison*, 19 *Ill.* 136.)

III. By the contract in question, (being clause No. 1 of the instruments under which the catttle were transported,) the defendant is absolved from liability for delays occasioned by the neglect, misconduct or misjudgment of its employees. (*French* v. *The Buffalo, N. Y. and Erie R. Co.*, 4 *Keyes*, 108, *and cases cited.*) A careful examination of the opinion of the Supreme Court, in *Alexander* v. *Greene*, (3 *Hill*, 9,) and of the opinion of Justice Bronson in the same case, as reported in 7 *Hill*, 533, and of the case

of *French* v. *The Buffalo, N. Y. and Erie R. Co.*, will lead to the conclusion that where goods are taken "at the risk of the owners," the carrier is relieved from all responsibility for the want of ordinary care of his employees, and is only liable for their willful misconduct or gross negligence; that it is somewhat difficult to maintain even this extent of liability under such a clause, and that it should not be extended to other contracts, like those in the case at bar, which, when construed by the light afforded by the character of the business, were evidently intended to relieve the company from every degree of negligence, from which it might lawfully free itself. That such is the legal interpretation of these contracts, see the opinion of the court in *Heineman* v. *The Grand Trunk Railway Co.*, (31 *How. Pr.* 430,) and the argument of the defendant's counsel, page 445. At any rate, it can hardly be claimed that, under these contracts, the defendant can be responsible for anything less than "gross negligence," as defined by the court, in *French* v. *The Buffalo, N. Y. and Erie Railway Co.*

IV. Under the charge of the judge, the jury found a verdict for damages for delay occasioned by the acts of Barnard; and the verdict cannot be sustained under the charge of the court, unless the act of Barnard in sending the telegram of March 16th was an act not included within the operation of the contract limiting the carrier's liability. Now the sending of this telegram was not, under the circumstances detailed in his evidence, and the evidence of Squires, an act of misconduct or neglect on his part. At any rate, it was not an act of gross negligence, in the legal signification of the term, and was not an act for which the defendant is responsible under the contracts. Barnard was engaged in the performance of most delicate and responsible duties to all the shippers over the road. That duty was done skillfully and with diligence. Because, through unforeseen circumstances, the result was unfor-

tunate, he should not be charged with negligence or misconduct.

V. The judge erred in charging the jury that the neglect of Barnard was the neglect of the defendant itself, so as to render it liable for his negligence, although it would not be liable for the negligence of its ordinary employees. This charge is based upon the idea that a common carrier may contract to protect itself from the consequences of the negligence of his servants, but not against his own; and that the defendant could not contract, at any rate did not contract, against the negligence of Barnard, because he was not an employee of the defendant, but was its representative in substantially the same manner as its board of directors. But, 1st. Barnard was, in every sense, an employee of the defendant. He was a subordinate under the control of a managing director, who was himself under the control of a board of directors. 2. It is enough that Barnard was an employee; his grade or rank is immaterial. The directors of a corporation are in no sense employed by it. They represent the stockholders who constitute the company. But whoever is employed by them is a servant of the company; the company may contract against the consequences of his negligence, and the contract affords no evidence of any distinction in the minds of the parties to it, between one class of employees and another. The rule forbidding a corporation to contract against its own negligence, only applies to cases where its affairs are conducted by a board of directors, or some body or person which represents the corporation, and is in no sense employed by it, and the neglect is the neglect of such board, body or person. (*See cases cited by Masten, J., in Heineman* v. *Grand Trunk Railway Co.,* 31 *How. Pr.* 454; *Vanderbilt* v. *Richmond Turnpike Co.,* 2 *Comst.* 479; *Dorr* v. *New Jersey Steam Navigation Company,* 1 *Kern.* 485; *Clark* v. *Rochester and Syr. R. R. Co.,* 14 *N. Y.* 510; *Wells* v. *N. Y. Cent. R. R. Co.,* 24 *N. Y.* 180; *Perkins* v. *The Same,* (*Id.* 196–214; *Bissell* v. *The Same,*

25 *id.* 442.) 3d. If a suit were brought by an employee of Barnard, in his department, against the defendant, for damages sustained by him, by Barnard's negligence, could the defendant be made liable upon the ground that he w the corporation, and not another employee? We in-t he could not. (*See Warner* v. *Erie R. Co.*, 39 *N. Y.* 58.) 4th. The defendant might lawfully stipulate against liability for its own simple neglect. (*Lee* v. *Marsh*, 43 *Barb.* 102. *See cases cited by Masten, J., in Heineman* v. *Grand Trunk Railway Co.*, 31 *How. Pr.* 454.) Public policy only requires that the carrier should not be permitted to stipulate against his own bad faith, recklessness and gross negligence.

VI. The evidence is undisputed that all the freight received was sent in the order in which it was received, and that the plaintiffs' cattle were forwarded as soon as they could be, according to said order, and for this reason the court erred in not directing a verdict for the defendant. There is no evidence that as between cattle and freight upon which parties would lose twenty per cent, if detained beyond Saturday night, the cattle should have had preference. The evidence is directly to the contrary. The evidence is conclusive that the road was well equipped; that the delay was caused by an overwhelming quantity of freight, caused by the expiration of the reciprocity treaty; and that the cattle were sent forward in their order.

VII. The rights of the parties are to be determined by the laws of Canada, for the reason that the contract was made in Canada, it was substantially to be performed in Canada, and the breach complained of took place in Canada. While the parties might have had in view the laws of the State of New York, as to matters connected with the delivery of the property, there is no evidence that this extended to the transportation in Canada. For a citation of authorities upon this point, see *Jewell* v. *Wright*, 30 *N. Y.* 259; *Story's Conflict of Laws*, §§ 307, 314; *Pope* v. *Nicker-*

son, 3 *Story's C. C. Rep.* 465; 2 *Kent's Com.* 454, 458–460; *Cox* v. *U. S.*, 6 *Pet.* 172; *Hale* v. *N. J. Steam Nav. Co.*, 15 *Conn.* 539. And, besides, the liability of the defendant must depend upon the powers of its agents to bind the corporation, and those must be determined by the laws of Canada. (*See reasoning of Judge Story in Pope* v. *Nickerson*, 3 *Story's C. C. Rep.* 475, *et seq.*)

VIII. If the rights of the parties are to be determined by the laws of Canada, then it is clear upon the testimony of McMichael, that the defendant should have had a verdict. And the court erred in charging the jury that it was for the court to construe the contracts, and that by such construction the defendant was liable for damage arising from its own neglect. If by this charge the court designed to charge the jury that it had a right to construe said contracts without regard to the laws of Canada, it was wrong, because the interpretation of contracts falls within the doctrine of the *lex loci;* as well as anything else. (*See* 2 *Kent's Com.* 458, 459, *and Story's Conflict of Laws*, 272, *a*, §§ 274–278, *and cases cited under point* 6.) If, on the other hand, the court intended to say that construing the contracts by the law of Canada, the defendant was liable for its own neglect, it was equally wrong, by reason of the undisputed evidence of McMichael, that the defendant was absolved by the contracts, interpreted by Canadian law, from such liability.

IX. The court erred in charging the jury that if any discrimination were made against the plaintiff's freight to their prejudice, the defendant was liable for any damage resulting therefrom. 1. On the contrary, the defendant claims that the defendant is not so liable unless such discrimination amounts to neglect or misconduct. If, at the time, it is made in good faith, for the interests of the public and the customers of the road, the defendant should not be made responsible because unforeseen circumstances intervene and produce a damage to the plaintiff. If by

delaying a load of lumber a day, under circumstances indicating no possible injury, a valuable cargo of produce belonging to another person, can be saved from destruction, what is the duty of the carrier? Is he bound by an iron rule, forbidding him to make any discrimination under any circumstances? 2. The damages are not the natural result of the discrimination, but were occasioned by inevitable accident. 3. There was no evidence upon which to found the charge. The discrimination did not damage the plaintiffs, because the telegram which, it is alleged, caused the discrimination, did not have that effect, but simply restored the cattle to their lawful order; and prevented a preference to which they were not entitled. 4. The same objection exists to the charge that the defendant had no right to discriminate between dutiable and undutiable freight. Such an act is not evidence of negligence or misconduct. If a carrier, acting with due diligence and judgment, does the best he can for the benefit of his employers, as a whole, the fact that in consequence of unforeseen circumstances, amounting to the act of God or inevitable accident, damage occurs to a single party, will not make the carrier liable at any rate, except as an insurer. But the carrier is not an insurer as to delays, but is only liable for delays occurring through negligence or misconduct. 5. But whatever may be the liability, under such circumstances, of a common carrier, in the absence of a special contract, it is conceded to be the law, that the contracts in this case exempt the defendant from all liability as an insurer, and leave it responsible only for actual neglect and misconduct; the sending of the telegram by Barnard, to hold the stock, was not a willful wrong; it was not a gross neglect; it was not an act of negligence or misconduct in any legal or moral sense. It was not, under the circumstances, even an error of judgment, although it resulted unfortunately. It is only under its strict liability as a common carrier that the defendant

is. liable for the consequences, and from that liability it is protected by the contract. 6. The cases holding that where the owner ships subject to all risks, he may still hold the carrier for losses by neglect or misconduct, are put upon the single ground that it cannot be supposed that the carrier intended to stipulate against his own misconduct or negligence; but it is entirely reasonable to suppose that he intended to guard himself against loss occurring by just such a cause as produced the damage in this case. It is covered by the language of the contract, and is within its intention and object. 7. Upon the same grounds there was error in the refusal of the court to charge that the defendant was not liable for any error of judgment on the part of Barnard.

*L. W. & L. L. Thayer*, for the respondents.

I. The defendant, as a common carrier, makes it a part of its business to transport cattle upon its road, and is equally liable for loss or damage, as in the transportation of other freight, and is equally an insurer of the property, except as against injuries arising from the nature and propensities of the animals, and which diligent care cannot prevent. (*Clarke* v. *Roch. and Syr. R. R. Co.*, 14 *N. Y.* 570.)

II. Assuming that the special agreement relied upon by the defendant is valid, it only relieved it from its liability as an insurer, or at most only from liability on account of those accidents, or contingencies, which were not caused by want of ordinary care and diligence on its part. 1. The rule is now very clearly established that contracts of this character should receive that construction which would be reasonable, and the parties to them will be presumed to intend. It is not enough for the defendant, that the language used in the agreement is doubtful or uncertain as to its meaning; the contract ought to be so explicit as to leave no reasonable doubt of its meaning or intent. (*Moore* v. *Evans*, 14 *Barb.* 524. *Scheiffelin* v.

*Harvey*, 6 *John.* 169. *Alexander* v. *Green*, 7 *Hill*, 533. *Wells* v. *The Steam Nav. Co.*, 4 *Seld.* 375. *French* v. *Buffalo, N. Y. and Erie R. Co.*, 4 *Keyes*, 108. *New Jersey Steam Nav. Co.* v. *Merchants' Bank*, 6 *How. U. S.* 344.)

In *Scheiffelin* v. *Harvey*, Judge Van Ness says: "It is undoubtedly true that the general operation of law may be controlled by the agreement of the parties; but such an agreement ought to be clear, and capable of but one construction, unequivocally and necessarily evincing that such was the intention of both the parties." In the case of *Alexander* v. *Green*, Senator Bokee says: "If the permit had been intended to exempt the defendants from the consequences of their own negligence, which the law fixes upon them, such intention ought to have been clearly and unequivocally expressed, so as to leave no room for doubt or misconstruction." In *Wells* v. *The Steam Nav. Co.*, where the contract was the same as above, Justice Mason says: "The permit in this case contains the contract, and the question is whether it by its terms discharges the defendant from all liability, not amounting to fraud or the want of good faith. I cannot think that the expression contained in it, 'at the risk of the master and owners thereof,' was understood by the parties as a protection against all kinds of negligence. It would be an extraordinary contract which should, in express terms, give such a latitude in the performing of a hired service of so important a character as the one under consideration; and to permit a contract to have so unreasonable an effect as it would imply, the intentions of the parties should be so clearly and unequivocally expressed as to leave no room for doubt or misconstruction. In this contract nothing is said about negligence." In neither of the last two cases referred to were the actions against common carriers, and the defendants were only liable for negligence, and in both cases the plaintiffs recovered, notwithstanding the special agreement. (*French* v. *Buffalo, N. Y.*

*and Erie R. R. Co.,* 4 *Keyes,* 108, *per Woodruff, J.*)   2. But
we insist that the contract in this case not only does not
by its terms exempt the defendant from liability, but on
the contrary, by the language employed, excludes any
such inference. It is a well established rule in the con-
struction of contracts, that the whole contract should be
read together, and language employed in one part may
be used to ascertain the meaning of the parties as to any
other part. The first clause of the contract in question is
as follows: " The owners of the within mentioned animals
undertake all risk of loss, injury, damage, *and other con-
tingencies,* in loading, unloading, conveyance and other-
wise." Here is not a word said about negligence of any
one, nor the least allusion to it. That cattle may acci-
dentally be injured by loading, unloading or conveyance,
without any gross negligence, or indeed without any neg-
ligence on the part of any one, is very apparent, and any
such clause would not attract the notice of the shipper.
Nor would he understand the word otherwise to extend
the exemption, or to relieve the carrier from any duty or
obligation to perform his part of the agreement. This
clause does not profess to relate to anything but " contin-
gencies." The third clause, however, uses very different
language : "When free passes are given to persons in charge
of animals, it is only on the express condition that the
railway company are not responsible for any *negligence, mis-
conduct or otherwise,* on the part of the company, or their
servants or any other person whomsoever," &c. One
would hardly suppose that the language used in this clause
was no broader, or comprehensive, than in the first, but it
is gravely contended that such is the fact. 3. The con-
struction of this contract as claimed by the defendant's
counsel would exempt the defendant from any duty or ob-
ligation to perform it at all. If the cattle could be retained
without food or water four days, they could four weeks.
If with impunity it could have detained the cattle until

seven had died, it could until all had, and then by carry-
ing the dead carcasses to Buffalo have claimed compen-
sation on the ground that the contract had been performed.
Not only, under that construction, is the company exempt
for the fraud, gross negligence of its agents and servants,
but for its own; as the learned counsel on the trial took
special pains to prove by a learned barrister, that under
the law of Canada such a contract would be legal. Of
course, the parties understood and intended that the con-
tract should have the effect that the law gives it. The
question is, were the plaintiffs presumed to so understand
it, or in other words, would it be a reasonable construc-
tion to say that the defendant was exempted, by the terms
of the contract, from all duties or obligations as a carrier?

III. The special contract is wholly without consider-
ation, and therefore invalid. The proof shows affirma-
tively that no deduction was made from the regular price
for carrying the cattle, but the defendant charged and re-
ceived the usual rates. Had the parties, the day before
the cattle were shipped, entered into a written agreement
embracing by its terms the same duties, obligations and
liabilities which the law imposes upon the defendant as a
common carrier; and had the plaintiffs, when the cattle
were shipped, signed the same contract as they did, no
one could pretend that it would have had any validity.
It clearly would have been, for want of a consideration, a
nudum pactum, and void. Yet there is no distinction in
principle between such a case and this. The law itself
creates the duties and obligations of a carrier, and the
agreement does not add to them. In this State, at least,
that fact is clearly recognized by the counsel for the dif-
ferent railways, as in all agreements to relieve themselves
from the liabilities imposed by law on carriers, they in-
sert a distinct consideration. And this position is sup-
ported by authority. In the case of *Bissell* v. *N. Y. Cent.
R. R. Co.*, (25 *N. Y.* 450,) Judge Selden says: "If he, in

fact, paid as a passenger the full fare allowed by law, or the usual fare, if less than that allowed by law, without reduction on account of his engagement to assume such risk, in my opinion the engagement would be without consideration, and not binding upon him or his representatives." The same principle is clearly recognized by Justice Woodruff in the case referred to above.

IV. The injuries complained of were not caused by the negligence of the employers, or subordinate agents or servants of the defendant, but by the directions of its officers and general agent. Barnard, as general superintendent of the road from Goderich to Buffalo, had the control of all the trains. He says he had the general charge of running the trains from Buffalo to Goderich, that week. He directed the stopping of the trains containing the cattle, and under his direction they were detained. Can it be pretended that his acts were unauthorized by the defendant? There is not a particle of proof that they were. On the contrary, does not the law presume that a general agent acts with the authority of his principal? It certainly would be so if the principal were an individual, and I am at a loss to see why the same presumption should not equally exist when the principal is a corporation. The corporation in this case is in England. Out of nine or eleven directors, only three reside in Canada. As the defendant's directors did not meet in Canada, it could only act there through its officers or agents. Barnard was the agent who had the general control on that portion of the road, and must be deemed to act with authority. (*Munn* v. *Commission Co.*, 15 *John.* 44. *Jeffrey* v. *Bigelow*, 13 *Wend.* 518. *Anderson* v. *Coonley*, 21 *id.* 279.) In the case of *Munn* v. *Commission Co.*, the defendants were a corporation, and the court says: " It makes no difference that the defendants were a corporation; for it is settled that they may be bound by the acts of their agents, in the same manner as private individuals."

V. But this is not a case of mere negligence, or want of ordinary care and diligence on the part of the defendant, or its agents, but it is one of grossest misconduct, and dereliction of duty. It would be a most unreasonable construction of the special agreement, to hold that it exempts the defendant from liability for such acts. The parties certainly did not contemplate any such effect.

VI. Whether live freight had any preference over dead freight, by the regulations of the company, is of no importance. It is enough for this case that the cattle were received, shipped and started. It was then too late to talk about preferences. Besides, if dispatch No. 1, referred to in Barnard's evidence, were made a part of the case, it would show that the cattle were shipped by his direction; but the fact that they were shipped by the defendant's agent at Goderich is equally conclusive on the defendant. But this pretense that other freight had any preference, and that the cattle were detained for that reason, is a pure fiction and afterthought. Barnards's dispatch shows that they were detained for no such reason. It also excludes · the pretext that the delay was occasioned on account of any blocking up of the road at Fort Erie. "Arrange," he says, "for as many specials to-morrow as will clear up the flour, grain, beef and pork, keeping back all stock, staves and lumber. There will no duty on stock. There is now a duty on staves, which will not be increased, and that on lumber is comparatively light." This shows that the sole object was to give a preference to freight which would become subject to duty on the expiration of the treaty, without reference to the time of its reception.

VII. The defendant had no right to give any such preference, to our prejudice. It certainly was too late to do so after it had received and shipped our cattle. There might have been some justification, at least humanity, in giving a preference to the cattle, after they had been put in a position where they could not be fed or watered; but no

pecuniary consideration, whether it went into Barnard's pocket, or any one else's, can justify such barbarity as this case discloses.

VIII. It is wholly immaterial what the laws of Canada are, so far as this case is concerned, as the contract was to be performed in this State. That the law of the place where the contract is to be performed, will govern in the construction of the contract, is too well settled, as well by adjudicated cases in England and America, as by elementary writers, to be open for discussion. (*Jewell* v. *Wright*, 27 *How.* 482, *and cases cited by counsel and court.*) The fact that in order to perform its agreement, the defendant transported the cattle through Canada, makes no difference. Suppose the carrier had lived at Detroit, (which is in a foreign State, so far as this question is concerned, as much as Canada,) and had made precisely the same contract. He might have sent the cattle by the Lake Shore, Grand Trunk, or Great Western roads. Would it depend upon what road they were sent, what law would govern the case? Had they been shipped by the State Line, and detained in Ohio or Pennsylvania, as they were at Brantford, could it be contended that we would have been bound by the law existing in either of those States? The gist of this action is the failure of the defendant to deliver the cattle at Buffalo within a reasonable time, as it had agreed, whereby we have been greatly damaged. We not only prove this, but prove that the defendant did not even use ordinary diligence to perform its agreement, but on the contrary was guilty of gross misconduct. We might have rested our case, upon proving that the cattle were shipped on the 15th, and did not arrive at Buffalo until the 19th, and that the usual time was from eighteen to twenty-two hours. Upon this proof we would have been entitled to recover. The defendant would at least be called upon to explain the reason why they were not delivered in the usual time.

Would it be a satisfactory explanation, to prove that the defendant did not try to do it?

Again, the injury was not caused by any act of the company or its agents, done in the performance of the agreement on its part, but in refusing to perform it. The injury was not caused in loading, unloading, or conveying, but in refusing to convey. Can it make any possible difference with the law applicable to this case, where the cattle were detained the longest time, whether on the other, or on this side of the line between Canada and the United States?

The only question in this case is as to the construction of the special contract. There is no question as to its validity, but as to its meaning. Upon that subject it speaks for itself, and it is clearly the duty of this court to construe it. On this subject the decisions of courts in Canada may be quoted as authority, the same as of the courts of Massachusetts, but with no greater force as law.

No errors were committed by the court upon the trial, and the judgment should be affirmed.

·JOHNSON, J. The injury here complained of arose directly from the detention of the plaintiffs' cattle, on a side track of the railroad, between three and four days, at a place where they could neither be fed nor watered. Several head died, and the others were greatly reduced in flesh and strength.

It is quite difficult to see how this detention of the train on the side track, for this length of time, can be regarded and held to be an act of negligence, in any degree. It was the deliberate, intentional act of the division freight superintendent of the defendant's road. It is precisely of the character of the act of any other party who, after he has undertaken the performance of a job, deliberately stops, and refuses to proceed until he has performed another job, subsequently undertaken. To call this negligence, or a

Keeney *v.* Grand Trunk Railway Company.

failure to perform by reason of negligence, would be a misnomer, and an abuse of legal terms. It is simply a deliberate, intentional breach, in no way arising from want of care and attention during performance, but solely from the will of the defaulting party, claiming the right to perform whenever it should suit its interest or convenience to perform. The defendant refused to be bound, or to undertake upon the ordinary rules governing common carriers of such property, but insisted upon a special contract, which should constitute the rule and regulate both the rights and liabilities of the respective parties. This special contract was entered into, and must control according to its true intent and meaning. What the meaning is, the court must determine. The defendant received the animals upon its cars, under this contract, and by its terms undertook to forward them to Buffalo, to the consignee, "subject to their tariff, and the conditions expressed." The tariff was, confessedly, paid, and all that remained to be done was for the defendant to forward the stock, according to their contract. The stock was started the same day it was received upon the cars, and taken a part of the way to Buffalo; and had the cars containing the stock been permitted to go on with the train, would have reached the place of destination the same night. Instead of this, the cars containing this property were, by a positive and peremptory order, when within sixty or seventy miles of the place of destination, detached from the train and placed upon a side track, where they were kept three or four days, and where several of the animals perished from hunger and the inclemency of the season, and others were greatly reduced in flesh, weakened, and otherwise injured. They were detained at a place where they could neither be fed nor watered, and where they could not with any safety be unloaded and taken out of the defendant's custody.

The only question in the case, in my judgment, is

whether, according to the " conditions expressed" in the special undertaking, the defendant had the legal right to suspend the performance of the undertaking which they had commenced, in this manner, and for this length of time, without rendering itself liable to the plaintiffs for damages occasioned by such suspension. I am clearly of the opinion that it had not. Whatever may be said of these conditions, it certainly cannot be affirmed that they extend to a case of damage arising from the deliberate and intentional act of the defendant, or its agents, in suspending performance after it had been commenced, and refusing to perform, or to allow performance, until after the property, or a portion thereof, had been destroyed, and other undertakings could be performed. In other words, the defendant did not reserve to itself the right to perform, or not, as it might afterwards elect, or to perform only as it might suit its interest, convenience or pleasure. Such an arrangement, had this been one of that character, could hardly be called a contract, as it would lack the essential ingredient of mutuality of obligation. The defendant here did undertake to forward the property to a particular place, but by the limitation in the second condition, it did not undertake to forward it "by any particular train, or at any specified hour." Nor did it undertake to become "responsible for the delivery of the animals within any certain time, or for any particular market." But to hold that this limitation of duty and liability thus expressed, gave to the defendant the right to perform, or not, as it might choose, or to perform only when it might be for its interest, convenience or pleasure to do so, and suspend performance when once commenced, until all the animals should have perished and become worthless to the owners, would be simply monstrous. No court, in my opinion, can be found to give, or tolerate, such an interpretation of the defendant's undertaking. It must have a reasonable interpretation.

Keeney *v.* Grand Trunk Railway Company.

Where the object of a contract is to relieve a party undertaking to perform, from some of the obligations and liabilities which the law imposes upon him in the absence of any express stipulation, it is to be construed in reference to that object and purpose. General expressions exempting a party from liability on account of injuries to property committed to his charge, should never be held to apply to injuries arising from the wrongful acts of the party undertaking, unless it is expressly so stipulated. It cannot be supposed that the owner of property intends to give a party to whom he intrusts, for the time being, its care and custody, license to injure or destroy it wantonly, with impunity, unless it is so expressly " nominated in the bond" or undertaking. It is quite incredible that the law holds differently, either in Canada or elsewhere in civilized countries. Courts never construe contracts so as to favor criminal acts, or intentional misconduct, unless constrained to do so by the clearest and most apt terms of the instrument.

If I am right in supposing that this is not a case of an injury arising from negligence in any degree, but a case of an injury arising from a deliberate and intentional refusal to perform, for the time being, then it is quite clear that the act of Barnard, the superintendent, was the act of the defendant, and the defendant is liable. In every case where a party who has engaged to perform certain labor or services, employs others to perform on his account, and such others, after commencing to perform, refuse to go on, or to allow the work to proceed, such refusal is the refusal of their employer, and if it amounts to a violation of the contract, it is the breach of the employer. Their misconduct, in such a case, is his misconduct, so far as it operates upon the contract and causes non-performance.

The order of the superintendent, who had charge of the freight business on that portion of the road over which

the property in question was to be forwarded, was positive, to keep "back all stock, staves and lumber," and the reason is assigned in the order. "There will be no duty on stock." The reciprocity treaty was about to expire, and other property on hand to be transported would become subject to the payment of a duty to our government if not forwarded forthwith. Therefore this agent of the defendant took it upon himself to discriminate in favor of the owners of such property, to the prejudice of the plaintiffs. Their property which was then on its passage was stopped, deliberately, upon this consideration, and the preference given to other property, contrary to the ordinary course of business. The obvious purpose and intention of the agent was to favor the owners of property about to become dutiable, and deprive our government of the benefit of duties it would otherwise be entitled to receive. Upon the plainest principles, it can make no manner of difference, whether this superintendent was authorized by the defendant to make this order, or not. He was its agent or employee to carry out and perform its contracts, and if he has deliberately broken them, instead of performing, the defendant must answer for such breach. It was not casual or accidental, but was the direct effect of design and plan. There is nothing about it partaking of the character of negligent conduct, in the legal sense of that term. The design of postponing performance with the plaintiffs was carried out, to their injury, and the question is whether the act is authorized by the "conditions expressed." I have endeavored to show that it is not, and am clearly of the opinion that the defendant is liable for the act of its agent, Barnard, in arresting the performance of the contract, whatever may have been his authority, so far as his act or order had the effect to prevent performance, and thus create a breach of such contract. It is always incumbent upon every party to a contract to see that it is performed, and if not, to respond

in damages for the loss occasioned by the non-perform-ance; and there is no exemption from this rule in favor of corporations.

The position of the defendant is, in my view, the same precisely that it would have been, had the engineer and conductor, and all the other hands upon the train, will-fully and intentionally deserted it, and refused to proceed any further, for the same length of time. In such a case, the question of the power of these persons to bind the corporation does not arise. If the corporation, by such agents, or by some other means, does not perform its en-gagements, it is bound to respond in damages for the breach, to the injured party, and must look for its redress to the agents who have failed to perform their duty.

When it is once settled that the contract was not per-formed by the defendant according to the true meaning and intention thereof, all other questions, except as to the proper measure of damages, become wholly immaterial.

The judgment should therefore be affirmed.

TALCOTT, J. It is settled, by the decisions in this State, that a carrier, even a railway company, may, by express contract, exempt itself from liability for damages result-ing from any degree of negligence on the part of its serv-ants, agents and employees. But it seems to be equally well settled, and to a great extent by the same authorities, that a contract, to have such effect, must be so clear and explicit in its terms as to leave no doubt that such was the intention of the parties. (*The New Jersey Steam Nav. Co.* v. *The Merchants' Bank,* 6 *How. U. S.* 344. *Wells and Tucker* v. *The Steam Nav. Co.,* 4 *Seld.* 375. *French* v. *The Buffalo, N. Y. and Erie R. Co.,* 4 *Keyes,* 108.)

The stipulation relied upon by the defendant to show its exemption from liability, in the present case, is as follows:

" 1. The owners of the within mentioned animals, un-

dertake all risk of loss, injury or damage, and *other contingencies,* in loading, unloading, conveyance and otherwise."

I am unable to distinguish the legal effect of the language here used, from the expression, "at the risk of the master and owners," or "at owner's risk." I do not think the use of the word "all" has made the stipulation any more extensive than it would otherwise have been. Unless the word "risk" be in some manner qualified, it must .embrace all those circumstances which fall within the term "risk." It seems to be well settled, and by the court of last resort, that the expression "at the owner's risk," or any equivalent expression, in such a contract, does not cover the *gross* negligence of the employees of the carrier, so as to exempt the principal from liability for damage caused by it. (*Scheiffelin* v. *Harvey,* 6 *John.* 175. *Alexander* v. *Greene,* 7 *Hill,* 533. *Wells and Tucker* v. *The Steam Nav. Co.,* 4 *Seld.* 375. *Perkins* v. *The New York Cent. R. R. Co.,* 24 *N. Y.* 196, 206. *New Jersey Steam Nav. Co.* v. *The Merchants' Bank,* 6 *How. U. S.* 344. *Smith* v. *The N. Y. Cent. R. R. Co.,* 24 *N. Y.* 222, 234, 235. *French* v. *The Buff. N. Y. and Erie R. Co.,* 4 *Keyes,* 108.)

The contract in question in this case presents two circumstances which much aid in thus limiting its construction :

*First.* All the risk embraced in it is confined to "contingencies," a word which, though capable of a much larger signification, would ordinarily be understood as referring only to accidents, or casualties, and as designed only, in such a case as this, to exempt the carrier from his common law liability as insurer against accidents, unattended by negligence.

*Second.* The third stipulation of the contract, applicable to persons in charge of animals, and to whom free passes are given, expressly and in terms exempts the company from responsibility for any negligence, default or misconduct of its servants. It is scarcely credible that the parties

who made this contract, intended to express the same idea, as to the exemption of the company from liability, by the language used in the first, as by that used in the third provision.

There was evidence given in the case tending to show that the injury to some of the cattle of the plaintiffs, and the death of others, had resulted from the gross negligence, and even the absolute misconduct of the employees of the defendant.

It is not easy to see how, if the term risk does not embrace the *gross* negligence of the carrier, it can be held to cover *any degree* of such negligence. Yet this distinction seems to have been insisted on in the cases referred to. If it is to be held that although the word "risk" does not cover the gross negligence of the carrier's servants, in such a contract, yet it does cover the slight, or any less degree of negligence, than what is termed "gross," there is a difficulty in upholding this verdict on the ground of negligence, namely, that it does not appear that the jury had decided upon the degree of negligence. The learned justice at *nisi prius* appears to have adopted the view of the defendant's counsel, that the contract, by its terms, did exempt the defendant from responsibility for any degree of negligence on the part of those who, in the language of the charge, are "ordinarily known as the employees of the defendant." But he further instructed the jury, in substance, that the defendant could not make a valid contract to exempt itself from liability for *its own* negligence, of whatever degree, and that the negligence of Barnard, the local superintendent of the defendant, was *its own* negligence, within the meaning of the instruction. To this I am unable to assent. To apply, with any degree of certainty, to a corporation, the two rules referred to by the learned justice, 1st. That the carrier cannot, by contract, exempt himself from liability for his own negligence; and, 2d. That such carrier may contract for exemption from

liability for the negligence of his servants and agents, is somewhat difficult, since a corporation can only act through its agents. The difficulty is in drawing the line between those agents whose negligence is to be deemed the negligence of the corporation, and those whose negligence is to be regarded as the negligence of mere agents, and covered by a contract such as the one in question is claimed by the defendant to be. In this case, it would seem that the discrimination was attempted to be made by confining the exemption to the negligence of those " ordinarily known as employees." I do not see that this presents any certain or safe rule, and am not able to say that there is a class of agents of railway companies " ordinarily known as employees," to be distinguished from another class not so known; nor do I know any means by which, if there be any such distinction, it is to be determined, as matter of law, whether a particular individual agent belongs to the one or the other class.

If it can be said that any agent who has the power, or is expected or accustomed to exercise any discretion, within the purview of his duties, is an agent whose negligence is that of the railway company itself, it will be found, I apprehend, that all its agents, down to engineers, conductors and track-masters, are expected and accustomed to exercise more or less discretion within the scope of their special employment and duties. We have not been referred to any adjudged case which seems to be an intelligible and direct authority upon this point, except the case of *Heineman* against this same defendant, in the Superior Court of Buffalo, and decided by a divided court, (31 *How. Pr.* 454.) The suggestion of the court in that case is, that the negligence, against liability for which it is unlawful for the corporation to contract, is confined to that of the board of directors. It seems to me, if the rule is to have any force, and it appears to be well established, the negligence, against liability for which a railway corpora-

tion is not permitted to contract, must be confined to that of the board of directors, or, at all events, cannot be extended beyond that of those managing officers who make the general regulations for the running of the trains and the transaction of the business of the road, for the government of others, binding upon all the subordinate agents.

It appears to me, therefore, that this verdict cannot be sustained under the charge of the court on the question of negligence. I am, however, inclined to the opinion that the verdict may be sustained upon the grounds stated in the accompanying opinion of my associate, Justice JOHNSON, to wit, that the question of negligence was wholly immaterial, inasmuch as the case, as admitted by the defendant, showed a willful abandonment of, and refusal to perform, the contract on its part, through its agents ; and therefore the instruction of the court, as to the right of the defendant to contract to relieve itself from responsibility for the negligence of its agents, could have produced no injury to the defendant, since a willful abandonment of, and refusal to perform, its contract, is something more than negligence, and something which it cannot be pretended was authorized by the stipulations annexed to the the contract.

Upon this ground, I concur in the affirmance of the judgment.

MULLIN, P. J., also concurred.

Judgment affirmed.

[FOURTH DEPARTMENT, GENERAL TERM, at Buffalo, June 6, 1870. *Mullin*, P. J., and *Johnson* and *Talcott*, Justices.]